Adam S. Lurie (*pro hac vice* pending)
Sean P. Mooney (*pro hac vice* pending)
**LINKLATERS LLP**
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
adam.lurie@linklaters.com
sean.mooney@linklaters.com

Ryan W. Koppelman (CA State Bar No. 290704)
**ALSTON & BIRD LLP**
1950 University Avenue, Suite 430
East Palo Alto, CA 94303
Telephone: (650) 838-2000
Facsimile: (650) 838-2001
ryan.koppelman@alston.com

*Attorneys for Plaintiff GENFIT S.A.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENFIT S.A.,<br><br>                              Plaintiff,<br><br>                    v.<br><br>CYMABAY THERAPEUTICS, INC.; AND DOES 1–10,<br><br>                              Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff GENFIT S.A. ("GENFIT" or "Plaintiff") files this Complaint against Defendant CymaBay Therapeutics, Inc. ("CymaBay") and Does 1 through 10 (together with CymaBay, "Defendants") for trade secret misappropriation as follows:

## INTRODUCTION

1.    CymaBay's Chief Regulatory and Compliance Officer and a leading doctor overseeing GENFIT's most important clinical drug trial caused CymaBay to willfully and maliciously misappropriate GENFIT's trade secrets.  Their conduct was brazen, illegal, and contrary to CymaBay's own hollow public claims that it seeks to "outperform" its "competition fairly and honestly" and "not through unethical or illegal business practices," such as "[a]cquiring proprietary information from others through improper means."

2.    In July 2020, CymaBay's Chief Regulatory and Compliance Officer, Klara Dickinson ("Compliance Officer Dickinson"), surreptitiously acquired from Dr. Gideon Hirschfield GENFIT's trade secret protocol (the "Protocol") for an important clinical trial.  The Protocol related to a Phase 3 clinical trial of elafibranor to treat primary biliary cholangitis ("PBC"), a severe liver disease with no effective therapies that could present a market opportunity of up to $1 billion by 2025, and up to $1.5 billion by 2035.

3.    Instead of refusing the trade secret Protocol and deleting it from her files as she knew was required, Compliance Officer Dickinson acquired the trade secret Protocol from Dr. Hirschfield.  When Compliance Officer Dickinson acquired the trade secret Protocol, it was repeatedly labeled "CONFIDENTIAL," and the trade secret Protocol was attached to an e-mail that Dr. Hirschfield forwarded from GENFIT *itself*, and this e-mail from GENFIT, as well as the Confidential Disclosure Agreement Dr. Hirschfield signed, expressly "prohibited" Dr. Hirschfield from providing the trade secret Protocol to any other party.  CymaBay then further misappropriated the trade secret Protocol, including through its disclosure within CymaBay and to other parties.

4.    This misappropriation occurred at a critical time in light of CymaBay's cratering business.  CymaBay is a biopharmaceutical company, like GENFIT, and is GENFIT's direct competitor.  A few months before CymaBay misappropriated the trade secret Protocol, CymaBay announced that it expected to incur "substantial losses" for "the foreseeable future" and that "there can be no assurance that we will

ever generate sufficient revenue to achieve and sustain profitability." To turn around CymaBay, CymaBay was counting on the development of a new drug, seladelpar, to compete with GENFIT's elafibranor. This effort too, though, was flailing. Shortly before CymaBay misappropriated the trade secret Protocol, the U.S. Food and Drug Administration ("FDA") placed a formal clinical hold on seladelpar and CymaBay suspended its Phase 3 studies of seladelpar, resulting in a reported 75% decline in the value of CymaBay securities.

5. However, in July 2020, the very same month that CymaBay misappropriated the trade secret Protocol, the FDA lifted the clinical hold on seladelpar, allowing CymaBay to resume its clinical programs in PBC and other liver-related diseases. In August 2020, CymaBay announced positive topline results from an earlier-terminated Phase 3 seladelpar study in PBC, "ENHANCE," for those patients who completed 12 and 26 weeks of the 52-week study. In August 2020, CymaBay also announced positive results from a Phase 2 study of seladelpar in PBC.

6. In October 2020, now in possession of the GENFIT trade secret Protocol, CymaBay reinitiated a previously-terminated Phase 3 study of seladelpar in PBC, "ASSURE." In early November 2020, CymaBay further announced that Dr. Hirschfield would be delivering a presentation on behalf of CymaBay and "sharing additional results from the ENHANCE study as [they] focus on initiating a new global Phase 3 study to support the registration of seladelpar for PBC." Shortly thereafter, CymaBay announced that it made "significant progress" in designing this new Phase 3 study, called "RESPONSE," in "the third quarter and through early November 2020." This is the *very same time period* during which CymaBay misappropriated GENFIT's trade secret Protocol. CymaBay expects to begin enrolling patients in that new Phase 3 study in the first quarter of 2021.

7. After receiving an anonymous whistleblower report concerning CymaBay's misappropriation of the trade secret Protocol, GENFIT immediately confronted CymaBay. In response, CymaBay effectively admitted to GENFIT that CymaBay had misappropriated the trade secret Protocol, conceding that CymaBay improperly acquired and disclosed it. CymaBay, however, concealed from GENFIT the seriousness of CymaBay's misappropriation, including that: (a) it was Compliance Officer Dickinson who improperly obtained the trade secret Protocol within CymaBay; (b) it was Dr. Hirschfield who improperly provided the trade secret Protocol to Compliance Officer Dickinson; and (c) CymaBay

viewed Compliance Officer Dickinson as "integral" to CymaBay's "efforts to bring seladelpar" to the market.  CymaBay otherwise refused to provide GENFIT additional information about CymaBay's misappropriation, and rejected GENFIT's request that CymaBay consent to an audit by an independent, neutral third party.  Despite purporting to cooperate with GENFIT, CymaBay's refusals as set forth above continued through the end of October 2020.  GENFIT was left with no alternative but to continue investigating CymaBay's misappropriation, and then to protect its critical trade secrets and vindicate its rights through the instant matter.

8.      For these reasons and those set forth below, GENFIT brings this action against CymaBay and Does 1 through 10 for trade secret misappropriation, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*, and for other violations of California common law.

<strong>PARTIES</strong>

9.      Plaintiff GENFIT is a French corporation with its principal place of business located at Parc Eurasanté, 885, avenue Eugène Avinée, 59120 Loos, France.

10.     Defendant CymaBay is a Delaware corporation with its principal place of business located at 7575 Gateway Blvd., Suite 110, Newark, California 94560.

11.     The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of Defendants sued herein as DOES 1 through 10, are unknown to Plaintiff, who sues those Defendants by fictitious names.  Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously-named Defendants is responsible for the unlawful conduct alleged herein, which proximately caused Plaintiff's injuries and damages.  When Plaintiff ascertains the true names and capacities of DOES 1 through 10, this Complaint will be amended to include those Defendants' true names and other relevant information.

<strong>JURISDICTION</strong>

12.     This Court has original subject matter jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 and 28 U.S.C. § 1331.

13.     This Court has supplemental jurisdictional over GENFIT's California state law claims pursuant to 28 U.S.C. § 1367.  These state law claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

14.     This Court also has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

15.     The Court has personal jurisdiction over Defendant CymaBay because its principal place of business is in this State.

**VENUE**

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant CymaBay has its principal place of business in Newark, California, which is within the Northern District of California, and conducts business in this District.

17.     Venue is also proper because a substantial part of the events or omissions giving rise to the claims herein occurred in the Northern District of California, and because a substantial part of the improperly obtained property that is the subject of the claims is situated in the Northern District of California.  Defendant CymaBay acquired, viewed and disclosed the misappropriated trade secrets in this District.  GENFIT is also informed and believes that its trade secrets reside in this District on, at minimum, Defendant CymaBay's computer hardware, software and/or within the knowledge of Defendant CymaBay's employees and agents.

**INTRADISTRICT ASSIGNMENT**

18.     This is an action for trade secret misappropriation, which is a claim involving Intellectual Property Rights.  Pursuant to Civil L.R. 3-2(c), this action should be assigned on a district-wide basis.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**A.     GENFIT And elafibranor, GENFIT's Leading Drug Candidate For Serious Liver-Related Diseases**

19.     GENFIT is a late-stage clinical biopharmaceutical company dedicated to the discovery and development of innovative drug candidates and diagnostic solutions targeting metabolic and liver-related diseases where there is considerable unmet medical need.  For over 20 years, GENFIT has been a leader

- 4 -

in the field of nuclear receptor-based drug discovery.  Its drug discovery efforts are based on selecting appropriate nuclear receptors as targets and utilizing rational drug design to optimize its drug candidates.

20.     GENFIT's most advanced drug candidate is elafibranor, which it has spent nearly 20 years and hundreds of millions of dollars developing.  Since 2016, GENFIT had been evaluating elafibranor in a pivotal Phase 3 clinical trial as a potential treatment for nonalcoholic steatohepatitis ("NASH").  However, in May 2020 GENFIT announced that the Phase 3 clinical trial of elafibranor in NASH did not meet the predefined primary endpoint of NASH resolution without worsening of fibrosis.

21.     After undertaking a comprehensive analysis of the full interim dataset and conducting additional analyses, GENFIT decided in July 2020 to end its clinical development of elafibranor in NASH given the low probability of success compared to the required expense necessary for further development.

22.     However, elafibranor remains GENFIT's leading drug candidate to treat PBC.  PBC can result in cirrhosis and other serious liver complications that may result in the need for liver transplant.  The current market size for second line therapies in PBC is currently estimated at ~$300 million, and is expected to grow to up to $1 billion by 2025 and could reach $1.5 billion by 2035.

23.     There is currently no cure for PBC, and the two drugs currently approved for the treatment of PBC are limited because of drug intolerance, lack of patient response, and safety issues.

24.     Based on clinical data, GENFIT believes elafibranor can provide benefits for patients with PBC without significant side effects, such as the serious liver injury or death and pruritus that have been associated with approved PBC treatments.

25.     Due to its limited resources, GENFIT must decide which product candidates to pursue and the amount of resources to allocate to each, and these strategic decisions can affect the development or timing of its business prospects.  GENFIT's corporate strategy is currently focused on, among other areas, the development of elafibranor in PBC, and its business currently depends substantially on the successful development and commercialization of elafibranor.

**B.     GENFIT Diligently Protects Its Trade Secrets And Other Intellectual Property**

26.     Because GENFIT operates in the highly competitive biopharmaceutical industry, it relies on numerous measures to protect its trade secrets and other intellectual property.  Protecting its trade secrets and other intellectual property is critical to GENFIT's business, and the unauthorized disclosure

of that information threatens its very viability.  For this reason, GENFIT takes all reasonable measures to guard its trade secrets, and took all such reasonable measures to protect the secrecy of the Protocol at issue here.

27.     For example, under French labor law, all employees of GENFIT are bound by its "Internal Rules of Procedure" (Règlement Intérieur).  The Internal Rules of Procedure provide in relevant part that due to GENFIT's research activities and status as a listed company, all documents and information related to its activities and economic situation, including its trade secrets, are confidential, and that all documents and materials available to employees in the course of their work are confidential and may not be disclosed to third parties external to GENFIT.  The Internal Rules of Procedure further mandate that employees must exercise the utmost discretion outside GENFIT with respect to all scientific, technical, financial, organizational or strategic information to which they are privy in the course of their work, and in particular to the extent the information relates to GENFIT and GENFIT's clients, patents, protocols and work processes and procedures.  A violation of the Internal Rules of Procedure is subject to disciplinary measures, including criminal prosecution.

28.     Further, GENFIT's Code of Business Conduct and Ethics forbids employees from disclosing or distributing the company's trade secrets and other confidential information, including among other things scientific and clinical data, manufacturing, preclinical results and programs, designs, and databases, unless authorized by GENFIT or if required by law.  Employees must also return all such confidential and/or proprietary information in their possession to GENFIT at the end of their employment.

29.     In addition, GENFIT executes employment contracts with all of its employees, including employees of GENFIT and its wholly-owned U.S. subsidiary, GENFIT Corp.  These employment contracts contain confidentiality provisions that protect GENFIT's trade secrets, and which provide in relevant part that:

> Except as Employee's job duties . . . may require, Employee shall not during Employee's employment or ever after termination of employment (for whatever reason) disclose or divulge to anyone (including a prospective or future employer) in any form (including a statement to the press or in any publication authored by or at direction of or with the assistance of Employee) or forum (including Internet "chat rooms" or websites) or use any trade secrets of [GENFIT] or for a period of two (2) years after termination of employment so disclose or use any confidential business information that Employee received or developed during the course of Employee's employment relating to [GENFIT's] drugs and

biomarkers candidates, research techniques and/or methodology, customer selling approaches, customer lists, customer preferences or identity of any customer, pricing structure, business process, computer programs, management information system, business or financial plans or reports, or other matters which are of a secret or confidential nature.

30.   Employees are also bound by GENFIT's "clean desk" policy, and must secure any confidential or proprietary GENFIT information (including trade secrets) in a locked cabinet at the end of each work day.  Employees similarly cannot take such information home with them without permission from a manager.  Relatedly, all documents, including the Protocol, containing confidential information are clearly marked as such.  GENFIT also maintains a color-coding system to indicate the level of secrecy attached to particular documents, and under this system the cover page of such documents must also clearly indicate who has authority to review it.

31.   GENFIT also relies on confidentiality and non-disclosure as well as intellectual property assignment agreements with its sponsored researchers, consultants, advisors, and potential collaborators.

32.   These agreements require that the other party keep secret and not disclose to third parties all trade secrets the party developed or that GENFIT made known to the party during the course of the party's relationship with GENFIT.  These agreements also require disclosure and assignment to GENFIT of ideas, developments, discoveries and inventions, including trade secrets, important to its business and vest GENFIT with exclusive ownership over all such information developed during the course of the party's relationship with GENFIT.

33.   GENFIT's policy is to require that such agreements be executed with all third parties engaged to assist with clinical trials, including the Phase 3 clinical trial being conducted under the trade secret Protocol at issue here.  For example, a standard GENFIT confidential disclosure agreement would protect the secrecy of the Protocol and GENFIT's ownership of such trade secrets by providing in relevant part as follows:

**2. Confidentiality obligation**

[Party] shall keep Confidential Information confidential and shall not disclose, distribute, publish, nor reproduce Confidential Information to any third parties, partially or fully, directly or indirectly, and in any manner whatsoever.

* * *

[Party] acknowledges that any Confidential Information of GENFIT is GENFIT's property.

**3. Use of Confidential Information**

[Party] agrees to use Confidential Information only (i) to evaluate its interest in pursuing the discussions with GENFIT, and (ii) to pursue the collaborative opportunity after the Parties have agreed to do so. [Party] agrees not to use any of the Confidential Information for any other purpose other than the Purpose unless as otherwise consented to in writing by GENFIT.

**4. Disclosure to Third Parties**

For the duration of this Agreement, [Party] agrees neither to disclose to any third party nor permit any third party to have access to any or all of the Confidential Information without GENFIT's prior written consent.

34. These standard confidential disclosure agreements define "Confidential Information" in relevant part as "any information, which is disclosed by or on behalf of GENFIT . . ., whether directly or indirectly, in writing, orally, electronically or in any other way, and whether or not this information is mentioned or marked as confidential," including but not limited to all information related to "the study, the study protocol, all information related to GENFIT's product, GENFIT's research programs (past, current and/or future), its protocols, its methods and procedures, its partners, vendors, providers, agents and employees, as well as its results of research, its development projects, its patents applications (current and/or future), its regulatory data or plans and all other strategic and business information relating to GENFIT's business in general."

35. Further, a standard service agreement that GENFIT will enter into with an institution and investigator for conducting its clinical trials, including the Phase 3 trial to be conducted under the Protocol, protects the secrecy of the Protocol and vests GENFIT with sole and exclusive ownership over all property related to the clinical trial, including the Protocol, and provides in relevant part as follows:

8. PROPERTY

All equipment, materials, documents, data, information and suggestions of every kind and description supplied to the Investigator or the Institution directly or indirectly by the Sponsor [*i.e.*, GENFIT] or prepared or developed by the Investigator or the Institution pursuant to the Agreement (except for Investigator or Institution procedural manuals, personnel data, and Investigator or Institution developed computer software), or resulting from the services provided hereunder shall be the sole and exclusive property of the Sponsor and be treated as Confidential Information (defined below); provided that the Investigator and Institution may retain copies of such materials as required by applicable laws, rules and regulations. The Sponsor shall have the right to make whatever use it deems desirable of any such materials, documents, data and information.

- 8 -

* * *

## 9. CONFIDENTIAL INFORMATION

The Investigator and the Institution agree that all material, documents and information provided to them by [omitted] or the Sponsor and all information developed by the Investigator or the Institution in connection with the Study for the Sponsor is and shall be considered as confidential information (collectively, the "Confidential Information") and the sole property of the Sponsor.  The Investigator and the Institution agree to hold such Confidential Information in strict confidence for fifteen (15) years after the date of this Agreement and shall disclose the Confidential Information to hospital authorities, institutional review boards, and their respective agents, employees, officers and directors and representatives only on a need-to-know basis and only if foregoing parties are bound and obligated by the same provisions of confidentiality as used by the Investigator and the Institution . . . .

The Investigator and the Institution will not use any such Confidential Information for their own benefit or for the benefit of any third party, and will not furnish to any third party any materials which incorporate any Confidential Information as otherwise herein above provided.  All obligations of confidentiality and non-use set forth in this Agreement will survive the expiration or earlier termination of this Agreement.

36.     Relatedly, standard intellectual property assignment clauses in third-party contracts GENFIT executes provide:

[Sample 1]:

All Results generated by [third party] and in the course of performing the Services shall be the sole and exclusive property of GENFIT who shall be free to use same at its discretion, and [third party] hereby assigns or otherwise transfers to GENFIT all right (including the right to use, reproduce and represent), title and interest that [third party] has or may have in and/or to such Results. . . .

[Sample 2]:

The Confidential Information imparted by or for GENFIT for the purpose of the Services shall remain GENFIT's sole property.  The hereby shall not be considered as granting the Supplier any right on the Confidential Information, or any other Intellectual Property right or title on the Confidential Information.

Intellectual Property Rights that are developed, generated or conceived in the performance of the Services shall be and at all times remain the sole property of GENFIT without any further compensation payable to Supplier.  No right or license is granted under this Agreement by either Party to the other party, either expressly or by implication.

37.     GENFIT also takes steps to protect the physical security of its premises to prevent unauthorized entry, including by limiting entry into offices to those with an access key.  GENFIT also protects the physical and electronic security of its information technology ("IT") systems.  For example,

- 9 -

GENFIT's IT department is entirely in-house, and it does not rely on third-party IT personnel.  GENFIT also hosts its data principally on its own IT infrastructure in segregated databases, and restricts access by users on a need-to-know basis through NT File System ("NTFS") permissions at the request of the manager.  GENFIT also uses firewalls, anti-virus and anti-spam mail software on workstations and servers, control of removable devices, and URL filtering.  Employees are also prohibited from using external hard drives, and may only use GENFIT's authorized conferencing technology when discussing confidential or proprietary GENFIT information.  Employees are regularly trained on IT risks.

38.     GENFIT cannot compete effectively without the ability to protect its trade secrets.  Its commercial success depends in large part upon trade secret protection of its current and future drug and biomarker candidates and the methods used to develop and manufacture them.

**C.   Elafibranor Receives "Breakthrough Therapy" Designation For The Treatment Of PBC In 2019**

39.     In December 2018, GENFIT announced positive preliminary results from its Phase 2 clinical trial of elafibranor in PBC.

40.     In April 2019, the FDA granted Breakthrough Therapy designation for elafibranor for the treatment of PBC based on the positive Phase 2 data.  A Breakthrough Therapy designation may be granted where a drug is intended, alone or in combination with one or more other drugs, to treat a serious or life-threatening disease or condition, and where preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints.

41.     For drugs that are designated as breakthrough therapies, interaction and communication between the FDA and the sponsor can help to identify the most efficient path for clinical development while minimizing the number of patients placed in ineffective control regimens.  The receipt of a breakthrough therapy designation does not assure faster or ultimate approval by the FDA.

42.     In July 2019, GENFIT also received from the FDA Orphan Drug designation for elafibranor for the treatment of PBC.  Under the Orphan Drug Act, the FDA may grant orphan designation to a drug intended to treat a rare disease or condition.  After the FDA grants orphan designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA.  Orphan

designation does not convey any advantage in or shorten the duration of the regulatory review and approval process.

43.     If a product that has orphan designation subsequently receives the first FDA approval for the disease or condition for which it has such designation, the product is entitled to orphan product exclusivity, which means that the FDA may not approve any other applications to market the same drug or biological product for the same indication for seven years, except in limited circumstances. Competitors, however, may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity.

**D.     Phase 3 Clinical Trial Of elafibranor In PBC Begins In 2020**

44.     Based on the positive Phase 2 results, GENFIT launched its Phase 3 program in 2019.

45.     Clinical trials are a necessary prerequisite before any new drug therapy will be approved by regulatory authorities, including the FDA.  Clinical trials involve the administration of the drug candidate to human subjects under the supervision of qualified investigators.  Clinical trials are typically conducted in three sequential phases prior to final FDA approval:

- *Phase 1*. Phase 1 clinical trials represent the initial introduction of a drug candidate into human subjects, frequently healthy volunteers.  In Phase 1, the drug candidate is usually tested for safety, including adverse effects, dosage tolerance, absorption, distribution, metabolism, excretion and pharmacodynamics.

- *Phase 2*. Phase 2 clinical trials usually involve studies in a limited patient population to (1) evaluate the efficacy of the drug candidate for specific indications, (2) determine dosage tolerance and optimal dosage and (3) identify possible adverse effects and safety risks.

- *Phase 3*. If a drug candidate is found to be potentially effective and to have an acceptable safety profile in Phase 2 clinical trials, the clinical trial program will be expanded to Phase 3 clinical trials to further demonstrate clinical efficacy, optimal dosage and safety within an expanded patient population at geographically dispersed clinical trial sites.

46.     Thus, a successful Phase 3 clinical trial is often the last major hurdle that must be cleared before final regulatory approval is granted and a new product can be marketed to the public.

47.     GENFIT often uses contract research organizations ("CROs") to assist with carrying out its clinical trials.  GENFIT also contracts with external investigators and other specialized services providers, for example with respect to certain statistical analyses, to perform services such as carrying out and supervising, and collecting, analyzing, and formatting of data for its trials.

48.     Clinical trials require significant amounts of time and capital to both design and carry out, and failure can occur at any stage.  Success in early clinical trials does not ensure that subsequent clinical trials will generate the same or similar results, and data obtained from trials are susceptible to varying interpretations, which may delay, limit, or prevent regulatory approval.  For example, if the results of the Phase 3 trial evaluating elafibranor in PBC do not achieve the primary efficacy endpoints or demonstrate expected safety, the prospects for approval of elafibranor in PBC would be materially and adversely affected.

49.     Clinical trials are conducted under the guidance of protocols, which detail, among other things, the objectives of the trial, the parameters to be used in monitoring safety, and the effectiveness criteria to be evaluated.  Protocols are like a "recipe" or a "blueprint" – no two protocols are the same.  A protocol for each clinical trial and any subsequent protocol amendments must be submitted to and approved by the FDA before the trial can begin.  Each clinical trial must also be reviewed and approved by an institutional review board ("IRB") at each of the sites at which the trial will be conducted.  The IRB will consider, among other things, ethical factors, the safety of human subjects, and the possible liability of the institution.  The particular design of a clinical trial is agreed to by regulatory authorities and will determine whether the results of a trial will support approval of a product, and flaws in the protocol of a clinical trial may not become apparent until the clinical trial is well-advanced.

50.     GENFIT's clinical trial protocols are proprietary and are developed by and at the direction of GENFIT over the course of many months (and, as in this case, sometimes longer than a year) with input from GENFIT, regulators such as the FDA, and specialist third parties (like Dr. Hirschfield), including key opinion leaders in the space, who are often retained to serve as investigators in trials on behalf of sponsors.

51.     Although GENFIT is involved in the design of the protocols for these trials and in monitoring them, it uses CROs and other third parties to carry out certain stages of test performance and

1  thus relies on third parties fulfilling their contractual and regulatory obligations, including by not

2  disclosing trade secret information entrusted to their care.

3       52.     It took over one year to design the trade secret Protocol at issue in this case, and it was

4  carefully tailored based on confidential discussions with and feedback from the FDA.  GENFIT began

5  designing the Protocol in early 2019, and, based on the positive Phase 2 results, met with the FDA in

6  September 2019 to discuss the Phase 3 program for elafibranor in PBC.  The FDA raised numerous

7  questions regarding the design of GENFIT's Phase 3 trial, including the selection of the primary endpoint.

8  As explained below, "endpoints" are the study measures by which the efficacy of a drug candidate is

9  assessed, and the primary endpoint is the most important measure of efficacy.  To address the FDA's

10 questions, GENFIT was required to engage with external consultants and to generate new data and

11 arguments to support the design of the trial.  Over the course of the following year, GENFIT had three

12 meetings with the FDA and defended the selection of the primary endpoint.  Eventually, the FDA accepted

13 the design of the Protocol in June 2020, thus allowing GENFIT to initiate a Phase 3 clinical trial.  That

14 trial, known as ELATIVE™, officially began in September 2020.  The trade secret Protocol is designed

15 to support initial approval of elafibranor on the basis of biochemical parameters, with full approval being

16 based upon long-term clinical events, which will take many years to accrue.  Indeed, GENFIT expects to

17 publish topline results from the ELATIVE™ trial in the first quarter of 2023.

18      53.     Under the FDA's regulations, drug sponsors are required to publicly disclose limited

19 information about their clinical trials, which information is ordinarily posted to www.clinicaltrials.gov.

20 Specifically, sponsors are required to submit the following four categories of information:

21      1.  **Descriptive information**, including among other things: (a) the primary purpose;
22          (b) study design; (c) primary disease or condition being studied; (d) intervention
            names, description, and type; (e) study start and completion date; and (f) primary
23          and secondary outcome measures;

24      2.  **Recruitment information**, including among other things: (a) eligibility criteria;
            (b) the sex/gender of eligible participants, and (c) age limits;
25

26      3.  **Location and contact information**, including among other things: (a) name of the
            sponsor; and (b) facility information; and

27

28

4. **Administrative data**, including among other things: (a) unique protocol identification number; (b) human subjects protection review board status; (c) record verification date; and (d) responsible party contact information.

54.     GENFIT first published this data with respect to the ELATIVE™ study on www.clinicaltrials.gov on August 26, 2020.

55.     However, most aspects of the trade secret Protocol are not required to be disclosed publicly, and GENFIT did not disclose such aspects, including:

1. <u>**The rationale for selecting the "randomization" ratio**</u>. The publicly disclosed data indicate that the study will be "randomized" (*i.e.*, some patients will receive a placebo while others will receive elafibranor). However, the trade secret Protocol explains that the randomization will be "stratified" on two factors (not disclosed publicly), which data would give competitors information about specific populations of interest that may serve as the basis to perform their own analyses to support label claims. These data could allow a competitor to design their study to ensure they have data from similar populations in order to be competitive.

2. <u>**The rationale for choosing the number of patients expected to be enrolled**</u>. The publicly disclosed data indicate the number of patients expected to be enrolled in the ELATIVE™ study, but do not explain GENFIT's rationale for selecting the number of participants. However, the trade secret Protocol explains the rationale and assumptions used in selecting the number of participants, including the expected response rates in the placebo and elafibranor groups that should demonstrate statistical significance between the two groups, which is an estimation of effect size. These data could allow a competitor to design their study to achieve greater differences between groups (*i.e.*, a greater effect size), thus supporting a more robust label claim and conferring a competitive advantage.

3. <u>**"Other" secondary endpoints**</u>. When clinical trials are designed, they pre-specify the study measures by which the efficacy of the drug is assessed, known as "endpoints." The publicly disclosed data indicate the "primary" endpoints, which are designed to measure the most important (or primary) questions asked by the clinical trial and which are intended to support marketing authorization. The publicly disclosed data also indicate the two key "secondary" endpoints, which could be used to support label claims. However, the trade secret Protocol discloses more than two-dozen other secondary endpoints not disclosed publicly. It is essential to understand the trial outcomes for *all* secondary measures monitored during the study, particularly because there are circumstances where the primary outcome measures suggest a drug is ineffective while the secondary outcome measures all indicate the drug is actually effective. A competitor with access to these "other" secondary endpoints, including how they will be assessed, would therefore have insight into scientific strategy and could design their own trials to ensure having similar (or potentially better) data, conferring a competitive advantage. Furthermore, there are additional and sensitive details in the trade secret Protocol pertaining to the "key" secondary endpoints, which could potentially support labeling claims by a competitor.

- 14 -

COMPLAINT

4. **Methods of measuring the primary and secondary endpoints**. Although, as indicated above, the publicly disclosed data indicate what the primary and "key" secondary endpoints are, they do not provide any other detail.  However, the trade secret Protocol discloses the anticipated effect size and the precise methods by which the endpoints will be analyzed, including the exact tests (and the frequency thereof) that will be used to assess efficacy as well as that statistical methodology, all of which are representative of iterative discussions, correspondence, and approval by regulatory authorities such as the FDA.

5. **Patient eligibility criteria**. Although the publicly disclosed data indicate certain criteria for patient inclusion or exclusion in the study, the trade secret Protocol contains additional criteria not disclosed publicly, as well as additional details about the publicly-disclosed criteria that are not disclosed.  Moreover, while patient eligibility for participation in clinical trials for a specific indication are generally comparable, there could be important differences between studies conducted by different sponsors, some of which could impart competitive advantage.  A specific example would be the mandatory requirement for patients to undergo an invasive procedure (*e.g.*, liver biopsy) to qualify for the study and as a follow-up procedure during the trial.  Patients having a choice of studies may opt for the trial without such a requirement, which may make it easier for a trial to enroll more quickly and which would be a competitive advantage.

6. **Safety monitoring**. The trade secret Protocol contains information about safety monitoring that are not disclosed publicly.  In particular, the trade secret Protocol discloses the specific types of safety events that a Data Safety Monitoring Board ("DSMB") and Clinical Event Committee ("CEC") will be monitoring during the ELATIVE™ study, all of which have been discussed with and approved by the FDA.  Thus, these data could provide a competitor valuable insight into the risk / benefit profile of its own drug candidate.  These data could in turn be a critical factor in the design of its clinical trials, in order to enable differentiation of the risk / benefit profile in the marketplace.

56.     The clinical trial Protocol, including the information in the Protocol identified in Paragraph 55 above, are trade secrets that GENFIT owns.  As explained above, the trade secret Protocol was designed by and at the direction of GENFIT.  In each element of the trade secret Protocol, GENFIT explains how it would conduct its clinical trial, and GENFIT's rationale for selecting each of those elements.  Before the FDA required GENFIT to disclose portions of the trade secret Protocol as discussed above, GENFIT only disclosed the trade secret Protocol on a need-to-know basis and subject to strict confidentiality protections as discussed more fully below.  Further, when GENFIT submits its clinical trial protocols to the FDA, it does so with the understanding that they constitute trade secrets and will not be improperly disclosed by the FDA.  The FDA is generally prohibited by law from disclosing trade secrets that are revealed to it in carrying out its regulatory duties.

57.     It is well-understood in the biopharmaceutical industry that clinical trial protocols are considered to be trade secrets that belong to drug sponsors.  As such, no sponsor would ever publicly disclose its clinical trial protocols except for the limited portions required by FDA regulations, as discussed above.  Even after these limited portions were disclosed publicly, the Protocol is still a trade secret that GENFIT owns because it contains a compilation of both public and non-public information related to the clinical trial.

58.     Such information, if it were to be made available to parties other than investigators or regulatory authorities, could permit external parties to gain insight into GENFIT's development plans and commercialization strategy for elafibranor in PBC and thus gain a competitive advantage based upon this knowledge.  For example, these trade secrets enable CymaBay to significantly minimize the time-, labor-, and capital-intensive process associated with its own Phase 3 protocol, and/or provide critical information to enhance the effectiveness of CymaBay's own Phase 3 protocol and overall Phase 3 program, thus expediting the development program of seladelpar and facilitating CymaBay's discussions with the FDA.  Even more, they provide invaluable insight into the current thinking of the FDA and the criteria the FDA has considered or approved to support future registration of investigational drugs for a PBC indication.  In other words, the Protocol is a cheat-sheet for CymaBay as CymaBay seeks to develop its own drug candidate to treat PBC, allowing CymaBay to present a camera-ready dossier to the FDA and avoid time-consuming and costly back-and-forth that is often necessary to be responsive to FDA comments, and potentially accelerate its development plans.  If successful, CymaBay may be able to obtain FDA authorization for the use of seladelpar to treat PBC before GENFIT, and even if it receives FDA authorization at the same time or after GENFIT, this would significantly reduce GENFIT's ability to commercialize elafibranor.

59.     Drug candidates in later stages of clinical development generally have higher development costs than those in earlier stages of clinical development, primarily due to the increased size and duration of later-stage clinical trials.  Thus, GENFIT expects to incur significant expenses as it continues to evaluate elafibranor in PBC, particularly during the critical Phase 3 ELATIVE™ study.

60.     As explained above and further below, GENFIT's policy is to protect all information developed with respect to GENFIT's clinical trials, including the trade secret Protocol at issue here,

through confidentiality and non-disclosure agreements that are specifically aimed to prevent anyone to whom the Protocol is disclosed by GENFIT from distributing it to third parties, and which also grant GENFIT exclusive ownership of all trade secret information contained in the Protocol.

**E.    GENFIT Enters Into Collaboration And Confidentiality Agreements With Dr. Hirschfield**

61.    ELATIVE™ is planned to involve 120 clinical trial sites in 15 countries and aims to confirm elafibranor's previously successful results of efficacy, potential improvement in pruritus, and safety in PBC patients.  To assist with the design and conduct of the ELATIVE™ study, GENFIT entered into a collaboration agreement on March 1, 2019, as well as a Confidential Disclosure Agreement ("CDA") on July 29, 2019, with Dr. Gideon Hirschfield, one of the principal purposes of which was to protect the secrecy of the Protocol.  Dr. Hirschfield is a world-renowned leader in liver medicine and is a highly sought-after investigator for clinical trials in PBC, and was intended to serve as a national coordinating investigator, Steering Committee member, advisor, and investigator for the ELATIVE™ study.

62.    The purpose of the collaboration agreement was to permit Dr. Hirschfield to "exchange with GENFIT, in a collaborative spirit, his know-how and knowledge in the field of PBC."  The terms of the collaboration agreement provided in relevant part that:

- Dr. Hirschfield was required to "handle as confidential, unless otherwise agreed in writ[ing] with GENFIT, all information belonging to GENFIT that [he] may have access [to] or generated in relation and during the performance of" the agreement.

- "All the data and results, including all supports generated under [the] Agreement and/ or as a consequence of the Mission carried out by [Dr. Hirschfield] shall be considered as GENFIT's exclusive property and Confidential Information."

- Dr. Hirschfield was prohibited from "disclos[ing] any of GENFIT's Confidential Information to any third party without prior written approval from GENFIT."

- All Confidential Information would remain GENFIT's property.

- "All the results generated following the expertise carried out by [Dr. Hirschfield] shall be GENFIT's exclusive property."

63.    The collaboration agreement defined "Confidential Information" in relevant part as "all information belonging to GENFIT that [Dr. Hirschfield] may have access [to] or generated in relation and during the performance of" the agreement, "whether or not . . . the information is marked or designated as

confidential or proprietary, whether disclosed directly or indirectly in writing, orally, electronically or by drawing or observation or by any other means."

64.     Consistent with GENFIT's standard practices to protect its trade secrets and other intellectual property, the CDA with Dr. Hirschfield also contained a confidentiality provision that provided in relevant part as follows (all emphasis added):

2. **Confidentiality obligation**

Institution and ***Principal Investigator undertakes to keep Confidential Information of GENFIT secret and confidential and undertakes not to disclose, distribute, publish, nor reproduce them to any third parties***, partially or fully, directly or indirectly, and in any manner whatsoever.

…

Institution and Principal Investigator agree that ***any Confidential Information of GENFIT is GENFIT's exclusive property***.

3. **Use of Confidential Information**

Institution and Principal Investigator agree to use Confidential Information received from GENFIT only (i) to evaluate its interest in pursuing the discussions with GENFIT, and (ii) to pursue the collaborative opportunity after the Parties have agreed to do so, but not for any other purpose.

4. **Disclosure to Third Parties**

From and after the Effective Date of this Agreement, ***Institution and Principal Investigator agree neither to disclose to any third party nor permit any third party to have access to any or all of the Confidential Information disclosed by GENFIT***, without its prior written consent, nor to use any of the Confidential Information for any purpose other than as consented to in writing by GENFIT.

6. **General Degree of Care**

***Institution and Principal Investigator undertake to keep Confidential Information safe . . . and agrees that it will take all reasonable measures to protect the secrecy of and to avoid disclosure or any unauthorised or fraudulent use of Confidential Information in order to prevent said information from falling into the public domain or the possession of unauthorized persons***. Institution and Principal Investigator agree to notify GENFIT in writing of any misuse or misappropriation of such Confidential Information that may come to its attention.

65.     The CDA defined "Confidential Information" in relevant part as:

*any information*, which is disclosed to Institution and Principal Investigator . . . ***related to the Purpose, the Clinical Study, the Clinical Study protocol, The Clinical Study synopsis of Protocol, the Clinical Study Investigational Brochure, the Clinical Study design*** including without limitation GENFIT's patients enrolment objectives, GENFIT's patients enrolment criteria (population, countries, potential clinical investigational sites, location and number, timelines), all information related to GENFIT's Product, GENFIT's research programs (past, current and/or future).

66.     During the course of his relationship with GENFIT, Dr. Hirschfield obtained valuable knowledge related to GENFIT's ELATIVE™ study.  For example, on June 17, 2020, Dr. Hirschfield participated as an expert consultant in a meeting with the FDA where detailed elements of the trade secret Protocol were discussed and agreed upon.

67.     On July 17, 2020, GENFIT provided to Dr. Hirschfield by e-mail the trade secret Protocol. The Protocol was subject to the confidentiality provisions of the CDA, and each page of the Protocol was marked "CONFIDENTIAL."  Further, Dr. Hirschfield received the e-mail from GENFIT, and that e-mail warned (all emphasis added):

This e-mail may contain confidential and/or privileged information for the sole use of the intended recipient.

***Any review or distribution by anyone other than the person for whom it was originally intended is strictly prohibited***.

If you have received this e-mail in error, please contact the sender and delete all copies.

Opinions, conclusions or other information contained in this e-mail may not be that of the organization.

**F.    CymaBay Compliance Officer Dickinson Improperly Acquires The Trade Secret Protocol From Dr. Hirschfield**

68.     Just over an hour after receiving the trade secret Protocol and in breach of the express confidentiality provisions discussed above, Dr. Hirschfield surreptitiously sent GENFIT's e-mail containing the trade secret Protocol to Compliance Officer Dickinson, informing her: "this was sent today to the Genfit investigators."

69.     CymaBay is GENFIT's most direct and key competitor, including with respect to elafibranor.

70.     Like GENFIT, CymaBay describes itself as "a clinical-stage biopharmaceutical company focused on developing and providing access to innovative therapies for patients with liver and other

chronic diseases with high unmet medical need." Its lead product candidate is seladelpar, a competitor to elafibranor.

71.     CymaBay has been seeking to develop seladelpar which – just like elafibranor – is being investigated as a potential treatment for PBC, and which is a competitor to elafibranor as a potentially new treatment for PBC.

72.     Seladelpar is a key part of CymaBay's strategy to save CymaBay from failure.   In December 2019, CymaBay "announced a reduction in workforce of approximately 60%" as well as "additional cost cutting measures," "primarily due to results from [its] Phase 2b clinical trials from [its] studies of seladelpar in NASH."  CymaBay's latest annual report, filed on Form 10-K with the U.S. Securities and Exchange Commission ("SEC") on March 16, 2020 ("2019 10-K"), explained in no uncertain terms that the company is struggling to survive, stating:

> To date, we have not generated any income from operations . . . [and] have an accumulated deficit of $625.9 million. . . . Further, we have terminated all of the clinical trials of seladelpar, and as a result all of our product candidates are at an early stage of development and will require additional work before they can be licensed or commercialized. Accordingly, we expect to continue to incur substantial losses from operations for the foreseeable future and there can be no assurance that we will ever generate sufficient revenue to achieve and sustain profitability.

73.     The 2019 10-K also explains that "[k]ey elements of [its] strategy have been to advance clinical development of seladelpar for patients with PBC, NASH and [primary sclerosing cholangitis ("PSC")], to strengthen our patent portfolio and other means of protecting exclusivity, and to evaluate other product candidates."  The 2019 10-K identifies elafibranor, being developed by GENFIT, as a direct competitor with seladelpar for the treatment of PBC.

74.     CymaBay has struggled with its development of seladelpar.  In late 2019, CymaBay "placed on hold all studies of seladelpar in subjects with PBC," including because of "initial histological observations in the Phase 2b study of seladelpar in NASH" which "were characterized by an interface hepatitis presentation, with or without biliary injury."  The FDA "agreed with this decision and subsequently placed a formal clinical hold on seladelpar in December 2019."  CymaBay later "terminated [its] Phase 3 and other NDA-enabling studies of seladelpar in subjects with PBC."

75.     In July 2020, however, the same month that CymaBay misappropriated the GENFIT trade secret Protocol, the FDA lifted the clinical hold on seladelpar, allowing CymaBay to resume its clinical programs in PBC, PSC, and NASH.  In August 2020, CymaBay announced positive topline results from one of its earlier-terminated Phase 3 studies of seladelpar in PBC, "ENHANCE," for those patients who completed 12 and 26 weeks of the 52-week study.  In light of this, CymaBay announced that it had "decided to focus on reinstating the clinical development program for seladelpar in PBC."  Later in August 2020, CymaBay also announced positive final results from a previously completed Phase 2 study of seladelpar in PBC.  In October 2020, now in possession of the GENFIT trade secret Protocol, CymaBay reinitiated its other, previously-terminated Phase 3 study of seladelpar in PBC, "ASSURE," which is a long-term open label study.  In early November 2020, CymaBay further announced that none other than Dr. Hirschfield would be delivering "a late-breaking presentation highlighting results from the ENHANCE Phase 3 study," and that it was "look[ing] forward to sharing additional results from the ENHANCE study as [they] focus on initiating a new global Phase 3 study to support the registration of seladelpar for PBC."  Dr. Hirschfield is a key advisor to CymaBay and has been for some time.  Indeed, when CymaBay announced in September 2019 that its Chief Medical Officer was leaving the company, CymaBay stressed to the public that Dr. Hirschfield "has been a close advisor to the company and will continue to provide key medical and clinical support to CymaBay."

76.     Also in November 2020, CymaBay announced that in the third quarter and through early November 2020, it "made significant progress" in designing and "restarting the development program for seladelpar in [PBC]" and that "[s]tart-up is well underway" for a new Phase 3 trial, called "RESPONSE." This is the exact same time period during which CymaBay misappropriated GENFIT's trade secret Protocol.  CymaBay's RESPONSE trial "is poised for first patient dosed in the first quarter of" 2021.

77.     As explained above, the trade secret Protocol would enable CymaBay to significantly minimize the time-, labor-, and capital-intensive process associated with its own Phase 3 protocol, and/or provide critical information to gain insight into GENFIT's development plans and commercialization strategy for elafibranor in PBC and enhance the effectiveness of CymaBay's own Phase 3 protocol and overall Phase 3 program, thus expediting the development program of seladelpar and facilitating CymaBay's discussions with the FDA.  Even more, it provides invaluable insight into the current thinking

1    of the FDA and the criteria the FDA has considered or approved to support future registration of

2    investigational drugs for a PBC indication.  In other words, the Protocol is a cheat-sheet for CymaBay as

3    CymaBay seeks to develop its own drug candidate to treat PBC, allowing CymaBay to present a camera-

4    ready dossier to the FDA and avoid time-consuming and costly back-and-forth that is often necessary to

5    be responsive to FDA comments, and potentially accelerate its development plans.   If successful,

6    CymaBay may be able to obtain FDA authorization for the use of seladelpar to treat PBC before GENFIT,

7    and even if it receives FDA authorization at the same time or after GENFIT, this would significantly

8    reduce GENFIT's ability to commercialize elafibranor.

9          78.     Importantly, Dr. Hirschfield is assisting CymaBay with its Phase 3 program of seladelpar

10   to treat PBC.  Further, CymaBay has publicly claimed that Compliance Officer Dickinson's "expertise

11   and leadership" is "integral" to CymaBay's "efforts to bring seladelpar to patients with liver diseases."

12   **G.      CymaBay Unlawfully Discloses The Protocol**

13         79.     Instead of refusing the trade secret Protocol and deleting it from her files as she knew was

14   required, Compliance Officer Dickinson acquired the Protocol from Dr. Hirschfield.  As alleged above,

15   and as was clear to Compliance Officer Dickinson upon receiving the trade secret Protocol, each page of

16   the Protocol was marked "CONFIDENTIAL."   In addition, the transmittal e-mail from GENFIT to Dr.

17   Hirschfield to which the Protocol was attached, and which Compliance Officer Dickinson acquired one

18   hour after Dr. Hirschfield received it from GENFIT, warned in relevant part: "This e-mail may contain

19   confidential and/or privileged information for the sole use of the intended recipient.  Any review or

20   distribution by anyone other than the person for whom it was originally intended is strictly prohibited.  If

21   you have received this e-mail in error, please contact the sender and delete all copies."  Compliance Officer

22   Dickinson also knew or should have known that the Protocol was sent to her in violation of Dr.

23   Hirschfield's CDA.  This is especially true here where Compliance Officer Dickinson is the CymaBay

24   official who acquired the trade secret Protocol from Dr. Hirschfield.  Compliance Officer Dickinson's job

25   is to ensure that CymaBay competes fairly and does not infringe its competitors' proprietary rights.

26   Moreover, and as alleged below, CymaBay relies on similar agreements to protect its trade secrets,

27   explaining in its 2019 10-K that they rely "on trade secret protection and confidentiality agreements to

28   protect [their] interests.  To this end, [they] require all . . . employees, consultants, advisors and other

- 22 -
COMPLAINT

contractors to enter into confidentiality agreements that prohibit the disclosure of confidential information."

80. CymaBay then further misappropriated the Protocol, including through its disclosure within CymaBay and to other parties.

81. On or about August 27, 2020, an anonymous whistleblower sent a report concerning CymaBay's misappropriation of the Protocol to GENFIT which stated in relevant part:

> Cymabay is unethical
> An investigator sent the Genfit [study] synopsis and feasibility [questionnaire] to the Cymabay executive team
> They did not delete the message
> They forwarded the message to others inside and outside of Cymabay.

82. On August 31, 2020, GENFIT, through its counsel, sent a letter to CymaBay confronting CymaBay with the whistleblower's allegations.

83. On September 2, 2020, CymaBay, through its counsel, responded in a letter which revealed only that "an employee" of CymaBay had received the Protocol, but concealed, among other things, that this "employee" was CymaBay's Chief Regulatory and Compliance Officer, and that Dr. Hirschfield provided the Protocol to CymaBay. Indeed, CymaBay stated to GENFIT, in relevant part, only that:

> [A]n employee of CymaBay did receive a copy of GENFIT S.A.'s ("GENFIT") feasibility questionnaire and draft protocol for its upcoming Phase 3 clinical trial of elafibranor in PBC. No one at CymaBay solicited these materials or knew in advance they would be sent. CymaBay is currently taking all diligent steps to delete the materials and to prevent the use of any non-public information. Please further be advised that CymaBay has not acquired or used any other non-public GENFIT information.

84. However, GENFIT's ongoing investigation has revealed more about the seriousness of CymaBay's misappropriation. For example, GENFIT has learned, among other things, that:

- Dr. Hirschfield provided CymaBay with the trade secret Protocol;

- CymaBay disclosed the trade secret Protocol within the company;

- CymaBay disclosed the trade secret Protocol to certain still unidentified third parties; and

- The unidentified "employee" referenced in CymaBay's September 2, 2020 letter to whom Dr. Hirschfield sent the trade secret Protocol, and is thus where the internal disclosure at CymaBay originated, was in fact CymaBay's Chief Regulatory and Compliance Officer, Klara Dickinson.

- 23 -
COMPLAINT

85.     GENFIT's investigation further revealed that CymaBay's conduct as set forth above was unlawful, and was knowingly contrary to CymaBay's public Code of Business Conduct and Ethics and SEC filings.   These materials further demonstrate the importance of the trade secrets that CymaBay misappropriated from GENFIT, and the severe harm that GENFIT has suffered, and will continue to suffer without the Court's assistance.

86.     Indeed, CymaBay's Code of Business Conduct and Ethics, which includes a section on "Fair Dealing," explains (all emphasis added):

> We strive to outperform our competition fairly and honestly.  Advantages over our competitors are to be obtained through superior performance of our products and services, ***not through unethical or illegal business practices***.  ***Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained***, or inducing improper disclosure of confidential information from past or present employees of other companies ***are prohibited***, even if motivated by an intention to advance our interests.  ***If information is obtained by mistake that may constitute a trade secret or other confidential information of another business***, or if you have any questions about the legality of proposed information gathering, ***you must consult your manager or the Compliance Officer***.

87.     CymaBay's Code of Business Conduct and Ethics further states that:

- One of its most important assets is its confidential information, which includes "nonpublic information that might be of use to competitors or harmful to the Company or its customers if disclosed, including, but not limited to, business, marketing and service plans, financial information, source codes, engineering and manufacturing ideas, inventions, laboratory notebooks, designs, [and] databases," and which "may be protected by patent, trademark, copyright and trade secret laws."

- Employees must take care to keep this information confidential, including by avoiding inadvertent disclosure.

88.     As a biopharmaceutical company experienced in conducting clinical trials, CymaBay thus knew that the Protocol was a highly sensitive trade secret belonging to GENFIT.

89.     CymaBay's 2019 10-K recognizes the fundamental role played by properly designed clinical trials, including study protocols, in the very survival of biopharmaceutical companies, warning its investors that (all emphasis added):

> Before obtaining regulatory approval for the sale of our product candidates, we must conduct additional clinical trials to demonstrate the safety and efficacy of our product candidates in humans.   Clinical testing is expensive, ***difficult to design and implement***,

can take many years to complete and is uncertain as to outcome.  A failure of one or more of our clinical trials can occur at any stage of testing.

* * *

We may experience a number of unforeseen events during clinical trials for our product candidates, including seladelpar, that could delay or prevent the commencement and/or completion of our clinical trials, including the following:

* * *

• *the clinical study protocol may require one or more amendments delaying study completion*; [. . . and]

• *clinical investigators or study subjects fail to comply with clinical study protocols*[.]

90.     CymaBay also warns about the risk of "delays in reaching agreement with the FDA or other regulatory authorities on final trial design."  CymaBay cautions investors that if its clinical trials are delayed or unsuccessful for any reason, its "development costs may increase, the approval process could be delayed, any periods during which we may have the exclusive right to commercialize our product candidates may be reduced and our competitors may bring products to market before us.  Any of these events could impair our ability to generate revenues from product sales and impair our ability to generate regulatory and commercialization milestones and royalties, all of which could have a material adverse effect on our business."

91.     CymaBay further recognizes that its success depends in large part on its ability to protect its trade secrets and other intellectual property rights, including by *not infringing other's proprietary rights*, explaining in its 2019 10-K (all emphasis added):

We . . . rely on trade secrets, know-how, continuing technological innovation and in-licensing to develop and maintain our proprietary position.  Our success depends in part on our ability to obtain, maintain and enforce proprietary protection for our product candidates, technology and know-how, *to operate without infringing the proprietary rights of others*, and to exclude others from infringing our proprietary rights. * * *

We also depend upon the skills, knowledge, experience and know-how of our management, research and development personnel, as well as that of our advisors, consultants and other contractors.  To help protect our proprietary know-how, which is not patentable, and for inventions for which patents may be difficult to enforce, we currently rely, and will in the future rely, on trade secret protection and confidentiality agreements to protect our interests.  To this end, *we require all of our employees, consultants, advisors and other contractors to enter into confidentiality agreements that prohibit the disclosure of confidential information*.

- 25 -

92.     Another portion of its 2019 10-K concedes that (all emphasis added):

We face the risk of potential **unauthorized disclosure or misappropriation of our confidential information**, including our intellectual property, by [contract service providers (CSPs)], which **may reduce our trade secret protection and allow our potential competitors to access and exploit our proprietary technology**, among other things.  If our CSPs do not successfully carry out their contractual duties or obligations, fail to meet expected deadlines, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for any other reasons, our clinical trials may be extended, delayed or terminated, and we may not be able to obtain regulatory approval for, or successfully commercialize our product candidates.  **As a result, our financial results and the commercial prospects for our product candidates that we develop would be harmed, our costs could increase, and our ability to generate revenues could be delayed**.

93.     Contrary to these statements and its purported commitment to "fair dealing" and confidentiality in its Code of Business Conduct and Ethics, CymaBay – and its Chief Regulatory and Compliance Officer – misappropriated GENFIT's trade secrets and disclosed them within CymaBay and to third parties, as discussed above.

**H.     CymaBay Refuses To Come Clean To, And Cooperate With, GENFIT**

94.     Throughout September and October 2020, GENFIT, through its counsel, communicated with CymaBay, through its counsel.  During such communications, GENFIT sought further information about CymaBay's misappropriation of the trade secret Protocol.  For example, GENFIT sought additional information regarding who received the trade secret Protocol, whether CymaBay or other parties used the trade secret Protocol, and whether CymaBay had destroyed the trade secret Protocol and otherwise eliminated CymaBay's ability to benefit from the trade secret Protocol.

95.     CymaBay, however, refused to provide such additional information.  CymaBay also refused GENFIT's request that CymaBay retain an independent audit firm to: (a) investigate CymaBay's misappropriation; (b) assess whether CymaBay had destroyed the trade secret Protocol and otherwise eliminated CymaBay's ability to benefit from the trade secret Protocol; and (c) determine whether, and to what extent, CymaBay or any other third parties may have improperly used GENFIT's trade secrets.

96.     CymaBay rejected GENFIT's proposal on the purported grounds that CymaBay would be unable to control the auditor, the audit would not be privileged, and CymaBay expressed concern that the

auditor could provide GENFIT with CymaBay's confidential information. GENFIT assured CymaBay that GENFIT would scope the audit to avoid disclosure of any such confidential information.

97. Nevertheless, CymaBay continued to refuse GENFIT's audit request or to provide GENFIT with additional information. CymaBay instead proposed hiring only an e-discovery vendor who would certify that CymaBay does not have GENFIT's trade secret information on its IT systems. CymaBay, however, refused to allow an audit which included anything further, and not even an examination of the most critical issues, including: (a) the identity of the third parties to whom CymaBay disclosed the trade secret Protocol; (b) what portion(s) of the trade secret Protocol were disclosed; (c) how and when they disclosed the trade secret Protocol; (d) the purpose for which CymaBay disclosed the trade secret Protocol, including any purpose involving efforts to harm or otherwise damage GENFIT; and (e) the extent to which CymaBay or any other third parties have improperly used GENFIT's trade secrets.

98. Upon information and belief, CymaBay continues to possess GENFIT's trade secrets, including the Protocol.

**FIRST CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*)**

99. GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 98 as though fully set forth herein.

100. The information described above, including the Protocol, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839 that relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport in interstate commerce.

101. GENFIT is the owner of the trade secrets described herein.

102. The trade secrets described herein derive independent value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by GENFIT's competitors, including CymaBay, or to other third parties who might obtain economic value from their disclosure or use.

103. At all times relevant herein, GENFIT has taken the above-described reasonable measures to protect the secrecy of its trade secrets, including that which Defendants have misappropriated.

104.    Defendants misappropriated GENFIT's trade secrets within the meaning of 18 U.S.C. § 1839 by acquiring the trade secrets while knowing or having reason to know that the trade secrets were acquired by improper means, including but not limited to, through misrepresentation or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, and by disclosing or using the trade secrets without GENFIT's express or implied consent.

105.    Defendants have failed to return the trade secrets that they misappropriated to GENFIT.

106.    Upon information and belief, Defendants still possess and use GENFIT's trade secrets to compete with/or otherwise harm GENFIT.

107.    Defendants' misappropriation proximately caused damages to GENFIT, including but not limited to, loss of profits, goodwill, competitive advantage and business opportunities.

108.    Defendants have been unjustly enriched as a further proximate result of their misappropriation of GENFIT's trade secrets.

109.    Defendants' actions in misappropriating GENFIT's trade secrets were willful and malicious, and done with the intent to injure GENFIT and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C).

110.    GENFIT's damages cannot be compensated through remedies at law alone.  GENFIT is therefore entitled to temporary, preliminary and permanent injunctive relief to protect the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing GENFIT's trade secrets, requiring Defendants to submit to a third-party audit to determine the extent of Defendants' past use and disclosure, requiring Defendants to turn over any and all copies of GENFIT's trade secrets to GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

### SECOND CAUSE OF ACTION
### Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426, *et seq.*)

111.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 110 as though fully set forth herein.

112.    The information described above, including the Protocol, constitute "trade secrets" within the meaning of Cal. Civ. Code § 3426.1.

113.    GENFIT is the owner of the trade secrets described herein.

114.    The trade secrets described herein derive independent value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by GENFIT's competitors, including CymaBay, or to other third parties who might obtain economic value from their disclosure or use.

115.    At all times relevant herein, GENFIT has taken the above-described reasonable measures to protect the secrecy of its trade secrets, including that which Defendants have misappropriated.

116.    Defendants misappropriated GENFIT's trade secrets within the meaning of Cal. Civ. Code § 3426.1 by acquiring the trade secrets while knowing or having reason to know that the trade secrets were acquired by improper means, including but not limited to, through misrepresentation or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, and by disclosing or using the trade secrets without GENFIT's express or implied consent.

117.    Defendants have failed to return the trade secrets that they misappropriated to GENFIT.

118.    Upon information and belief, Defendants still possess and use GENFIT's trade secrets to compete with/or otherwise harm GENFIT.

119.    Defendants' misappropriation proximately caused damages to GENFIT, including but not limited to, loss of profits, goodwill, competitive advantage and business opportunities.

120.    Defendants have been unjustly enriched as a further proximate result of their misappropriation of GENFIT's trade secrets.

121.    Defendants' actions in misappropriating GENFIT's trade secrets were willful and malicious, and done with the intent to injure GENFIT and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to Cal. Civ. Code § 3426.3.

122.    GENFIT's damages cannot be compensated through remedies at law alone.  GENFIT is therefore entitled to temporary, preliminary and permanent injunctive relief to protect the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing GENFIT's trade secrets, requiring Defendants to submit to a third-party audit to determine the extent of Defendants' past use and

COMPLAINT

disclosure, requiring Defendants to turn over any and all copies of GENFIT's trade secrets to GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

**THIRD CAUSE OF ACTION**
**Intentional Interference With Prospective Economic Advantage**

123.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 122 as though fully set forth herein.

124.    For the past 20 years, GENFIT has established ongoing economic relationships with its customers to develop, test, and update medical therapies, including drug candidates and diagnostic solutions.

125.    Defendants knew of the relationship between GENFIT and its customers.

126.    By knowingly accepting, misappropriating, and disclosing GENFIT's trade secrets, Defendants have prevented and intend to prevent GENFIT from providing its customers with the medical therapies it is developing and testing.

127.    Defendants knew that misappropriating GENFIT's trade secrets would hinder or prevent GENFIT from providing its customers with the medical therapies it is developing and testing.

128.    As a direct and proximate result of Defendants' acceptance, misappropriation, and disclosure of GENFIT's trade secrets, GENFIT has been and will be harmed, in an amount to be determined at trial.

129.    GENFIT is entitled to compensatory damages in an amount to be proven at trial.

130.    Defendants have acted in a wanton, willful, and outrageous manner in interfering with GENFIT's customer relationships, and as such GENFIT is entitled to punitive damages in an amount to be proven at trial.

131.    Because GENFIT's damages cannot be adequately compensated through remedies at law alone, GENFIT is also entitled to temporary, preliminary and permanent injunctive relief to protect the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing GENFIT's trade secrets, requiring Defendants to submit to a third-party audit to determine the extent of Defendants' past use and disclosure, requiring Defendants to turn over any and all copies of GENFIT's trade secrets to

COMPLAINT

GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

## FOURTH CAUSE OF ACTION
### Negligent Interference With Prospective Economic Advantage

132.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 131 as though fully set forth herein.

133.    For the past 20 years, GENFIT has established ongoing economic relationships with its customers to develop, test, and update medical therapies, including drug candidates and diagnostic solutions.

134.    Defendants knew or should have known about the relationship between GENFIT and its customers.

135.    By knowingly accepting, misappropriating, and disclosing GENFIT's trade secrets, Defendants have prevented and intend to prevent GENFIT from providing its customers with the medical therapies it is developing and testing.

136.    Defendants knew or should have known that misappropriating GENFIT's trade secrets would hinder or prevent GENFIT from providing its customers with the medical therapies it is developing and testing.

137.    Defendants failed to act with reasonable care by misappropriating GENFIT's trade secrets.

138.    As a direct and proximate result of Defendants' acceptance, misappropriation, and disclosure of GENFIT's trade secrets, GENFIT has been and will be harmed, in an amount to be determined at trial.

139.    GENFIT is entitled to compensatory damages in an amount to be proven at trial.

140.    Defendants have acted in a wanton, willful, and outrageous manner in interfering with GENFIT's customer relationships, and as such GENFIT is entitled to punitive damages in an amount to be proven at trial.

141.    Because GENFIT's damages cannot be adequately compensated through remedies at law alone, GENFIT is also entitled to temporary, preliminary and permanent injunctive relief to protect the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing GENFIT's trade

secrets, requiring Defendants to submit to a third-party audit to determine the extent of Defendants' past use and disclosure, requiring Defendants to turn over any and all copies of GENFIT's trade secrets to GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims herein so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, inclusive as follows:

1. Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial;

2. Granting a temporary restraining order and a preliminary and permanent injunction enjoining or otherwise requiring Defendants, and any other person or entity participating with or acting for, on behalf of, or in concert with Defendants, including but not limited to their affiliates, officers, directors, shareholders, and employees:

    a. From directly or indirectly obtaining, accessing, using, altering, destroying, or copying, disclosing, disseminating, transmitting, or moving to any person or entity other than Plaintiff any of Plaintiff's trade secrets, in whatever form, including but not limited to the Protocol or any information related thereto;

    b. From altering, destroying, concealing, erasing, losing, or disposing of any evidence or other materials relating to this action, including but not limited to the Protocol;

    c. To account for all of GENFIT's misappropriated trade secrets, including by submitting their computers, smartphones, and electronic devices, and to provide access to Defendants' cloud storage services, e-mail servers, or other repositories of electronic

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

information, to a neutral forensic expert who will perform an audit at Defendants' sole expense; and

    d.   Granting such other injunctive relief as is proper;

3.  Granting a permanent injunction enjoining or otherwise requiring Defendants, and any other person or entity participating with or acting for, on behalf of, or in concert with Defendants, including but not limited to their affiliates, officers, directors, shareholders, and employees:

    a.   From making, testing, promoting, offering to sell, marketing, or selling therapeutics, drugs, and/or products of any kind that utilize, embody, or were developed, in whole or in part, with the benefit or use of any of GENFIT's trade secrets for three (3) years to prevent unjust enrichment in the form of a "head start" Defendants may have gained from their misappropriation of GENFIT's trade secrets;

    b.   From utilizing any processes or methods that are derived from, contain, or embody, in whole or in part, any of GENFIT's trade secrets; and

    c.   From launching, or filing with any regulatory body, any therapeutics, drugs, and/or products that compete with elafibranor, including but not limited to seladelpar, for three (3) years;

4.  Awarding punitive and/or exemplary damages in favor of Plaintiff and against Defendants in an amount to be determined at trial;

5.  Awarding Plaintiff pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

6.  Granting Plaintiff such other further relief as this Court deems just and proper.

COMPLAINT

1    Dated: January 15, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ADAM S. LURIE
SEAN P. MOONEY
**LINKLATERS LLP**

AND

RYAN W. KOPPELMAN
**ALSTON & BIRD LLP**

*/s/ Adam S. Lurie*

Adam S. Lurie

*Attorneys for Plaintiff GENFIT S.A.*

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature (/s/) within this e-filed document.

*/s/ Ryan W. Koppelman*

COMPLAINT