Adam S. Lurie (admitted *pro hac vice*)
Sean P. Mooney (admitted *pro hac vice*)
**LINKLATERS LLP**
1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
sean.mooney@linklaters.com

Ryan W. Koppelman (CA State Bar No. 290704)
Katherine G. Rubschlager (CA State Bar No. 328100)
**ALSTON & BIRD LLP**
1950 University Avenue, Suite 430
East Palo Alto, CA 94303
T: (650) 838-2000
F: (650) 838-2001
ryan.koppelman@alston.com
katherine.rubschlager@alston.com

*Attorneys for Plaintiff GENFIT S.A.*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENFIT S.A., <br><br> Plaintiff, <br><br> v. <br><br> CYMABAY THERAPEUTICS, INC.; AND DOES 1–10, <br><br> Defendants. | Case No. 3:21-cv-00395-MMC <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** <br><br> **JURY TRIAL REQUESTED** |

Plaintiff GENFIT S.A. ("GENFIT" or "Plaintiff") files this First Amended Complaint against Defendant CymaBay Therapeutics, Inc. ("CymaBay") and Does 1 through 10 (together with CymaBay, "Defendants") for trade secret misappropriation and other statutory and common law violations as follows:

## INTRODUCTION

1.      CymaBay's Chief Regulatory and Compliance Officer, together with a leading doctor overseeing GENFIT's most important clinical drug trial, caused CymaBay to willfully and maliciously misappropriate GENFIT's trade secrets.  Their conduct was brazen, illegal, and contrary to CymaBay's own hollow public claims that it seeks to "outperform" its "competition fairly and honestly" and "not through unethical or illegal business practices," such as "[a]cquiring proprietary information from others through improper means."

2.      In July 2020, CymaBay's Chief Regulatory and Compliance Officer, Klara Dickinson ("Compliance Officer Dickinson"), surreptitiously acquired from Dr. Gideon Hirschfield GENFIT's trade secret protocol (the "Protocol") for an important clinical trial.  The Protocol related to a Phase 3 clinical trial of elafibranor to treat primary biliary cholangitis ("PBC"), a severe liver disease with no effective therapies that could present a market opportunity of up to $1 billion by 2025, and up to $1.5 billion by 2035.  Dr. Hirschfield is the Director of the Autoimmune Liver Disease Programme, as well as the Lily and Terry Horner Chair in Autoimmune Liver Disease Research, at the Toronto Centre for Liver Disease.  Dr. Hirschfield is also a Professor of Medicine in the Division of Gastroenterology at the University of Toronto.  He is one of the world's preeminent scientists in the field of liver-related diseases with a wealth of experience in conducting clinical trials, and was intended to serve as the lead investigator for GENFIT's Phase 3 trial.  In providing the trade secret Protocol and other confidential and proprietary information about GENFIT's Phase 3 trial to CymaBay, and in promoting his own interests and those of CymaBay's over – and at the expense of – GENFIT's interests, Dr. Hirschfield breached his fiduciary duties to GENFIT.

3.      Instead of refusing the trade secret Protocol and deleting it from her files as she knew was required, Compliance Officer Dickinson acquired the trade secret Protocol from Dr.

Hirschfield.  When Compliance Officer Dickinson acquired the trade secret Protocol, it was repeatedly labeled "CONFIDENTIAL," and the trade secret Protocol was attached to an e-mail that Dr. Hirschfield forwarded from GENFIT *itself*, addressed to him in his capacity as a GENFIT "investigator," and Dr. Hirschfield made clear therein to Compliance Officer Dickinson that he was among "the Genfit investigators" who received from GENFIT the e-mail and trade secret Protocol.  Further, this e-mail from GENFIT, as well as the Confidential Disclosure Agreement Dr. Hirschfield signed, expressly "prohibited" Dr. Hirschfield from providing the trade secret Protocol to any other party.  CymaBay then further misappropriated the trade secret Protocol, including through its disclosure within CymaBay and to other parties.  When doing so and when acquiring and disclosing other GENFIT confidential and proprietary information from Dr. Hirschfield, Compliance Officer Dickinson and CymaBay knew that Dr. Hirschfield had breached his fiduciary duties to GENFIT, and CymaBay thus aided and abetted Dr. Hirschfield's breach of fiduciary duty.

4.     This misconduct occurred at a critical time in light of CymaBay's cratering business.  CymaBay is a biopharmaceutical company, like GENFIT, and is GENFIT's direct competitor.  A few months before CymaBay misappropriated the trade secret Protocol, CymaBay announced that it expected to incur "substantial losses" for "the foreseeable future" and that "there can be no assurance that we will ever generate sufficient revenue to achieve and sustain profitability."  To turn around CymaBay, CymaBay was counting on the development of a new drug, seladelpar, to compete with GENFIT's elafibranor.  This effort too, though, was flailing. Shortly before CymaBay misappropriated the trade secret Protocol, the U.S. Food and Drug Administration ("FDA") placed a formal clinical hold on seladelpar and CymaBay suspended its Phase 3 studies of seladelpar, resulting in a reported 75% decline in the value of CymaBay securities.

5.     However, in July 2020, the very same month that CymaBay misappropriated the trade secret Protocol and other GENFIT proprietary and confidential information with Dr. Hirschfield, the FDA lifted the clinical hold on seladelpar, allowing CymaBay to resume its clinical programs in PBC and other liver-related diseases.  Dr. Hirschfield participated in discussions with

1    the FDA on CymaBay's behalf in order to assist in having the clinical hold lifted.  Indeed, Dr.

2    Hirschfield was a "close advisor" to CymaBay and was assisting CymaBay with its current Phase

3    3 clinical trial of seladelpar.  CymaBay describes Dr. Hirschfield as one of two of its "lead principal

4    investigators" in PBC.  In August 2020, CymaBay announced positive topline results from an

5    earlier-terminated Phase 3 seladelpar study in PBC, "ENHANCE," for those patients who

6    completed 12 and 26 weeks of the 52-week study.  Dr. Hirschfield assisted CymaBay with that

7    study as well.  In August 2020, CymaBay also announced positive results from a Phase 2 study of

8    seladelpar in PBC.

9         6.     In October 2020, now in possession of the GENFIT trade secret Protocol, CymaBay

10   reinitiated a previously-terminated Phase 3 study of seladelpar in PBC, "ASSURE."  In early

11   November 2020, CymaBay further announced that Dr. Hirschfield would be delivering a

12   presentation on behalf of CymaBay and "sharing additional results from the ENHANCE study as

13   [they] focus on initiating a new global Phase 3 study to support the registration of seladelpar for

14   PBC."  Shortly thereafter, CymaBay announced that it made "significant progress" in designing

15   this new Phase 3 study, called "RESPONSE," in "the third quarter and through early November

16   2020."  This is the *very same time period* during which CymaBay misappropriated GENFIT's

17   trade secret Protocol.  CymaBay announced in March 2021 that patient recruitment is underway.

18         7.     After receiving an anonymous whistleblower report concerning CymaBay's

19   misappropriation of the trade secret Protocol, GENFIT immediately confronted CymaBay.  In

20   response, CymaBay effectively admitted to GENFIT that CymaBay had misappropriated the trade

21   secret Protocol, conceding that CymaBay improperly acquired and disclosed it.  CymaBay,

22   however, concealed from GENFIT the seriousness of CymaBay's misappropriation, including

23   that: (a) it was Compliance Officer Dickinson who improperly obtained the trade secret Protocol

24   within CymaBay; (b) it was Dr. Hirschfield who improperly provided the trade secret Protocol to

25   Compliance Officer Dickinson; and (c) CymaBay viewed Compliance Officer Dickinson as

26   "integral" to CymaBay's "efforts to bring seladelpar" to the market.  CymaBay otherwise refused

27   to provide GENFIT additional information about CymaBay's misappropriation, and rejected

28   GENFIT's request that CymaBay consent to an audit by an independent, neutral third party.

1    Despite purporting to cooperate with GENFIT, CymaBay's refusals as set forth above continued

2    through the end of October 2020.  CymaBay's misconduct also led to the foreseeable decision

3    between GENFIT and Dr. Hirschfield to end all involvement by Dr. Hirschfield in GENFIT's

4    Phase 3 clinical trial.  What is more, it led to the foreseeable termination of GENFIT's selection

5    of the University of Toronto as one of the sites for the Phase 3 trial, as well as the termination of

6    GENFIT's relationship with a Senior Biostatistician at the Toronto Centre for Liver Disease – a

7    close colleague of Dr. Hirschfield's who was also a key consultant for the trial – all out of concern

8    that the continuation of such relationships would be impossible in light of Dr. Hirschfield's

9    misconduct. This, in turn, has disrupted GENFIT's plans to introduce elafibranor to the well-

10   defined market of patients who suffer from PBC after the successful completion of its Phase 3 trial.

11   GENFIT was left with no alternative but to continue investigating CymaBay's misappropriation,

12   and then to protect its critical trade secrets and vindicate its rights through the instant matter.

13        8.      For these reasons and those set forth below, GENFIT brings this action against

14   CymaBay and Does 1 through 10 for trade secret misappropriation, in violation of the Defend

15   Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and California Uniform Trade Secrets Act, Cal. Civ.

16   Code § 3426, *et seq.*, and for other violations of California common and statutory law.

17                                              **PARTIES**

18        9.      Plaintiff GENFIT is a French corporation with its principal place of business

19   located at Parc Eurasanté, 885, avenue Eugène Avinée, 59120 Loos, France.

20        10.     Defendant CymaBay is a Delaware corporation with its principal place of business

21   located at 7575 Gateway Blvd., Suite 110, Newark, California 94560.

22        11.     The true names and capacities, whether individual, corporate, partnership,

23   associate, or otherwise of Defendants sued herein as DOES 1 through 10, are unknown to Plaintiff,

24   who sues those Defendants by fictitious names.  Plaintiff is informed and believes, and thereon

25   alleges, that each of the fictitiously-named Defendants is responsible for the unlawful conduct

26   alleged herein, which proximately caused Plaintiff's injuries and damages.  When Plaintiff

27   ascertains the true names and capacities of DOES 1 through 10, this First Amended Complaint

28   will be amended to include those Defendants' true names and other relevant information.

1

**JURISDICTION**

2      12.     This Court has original subject matter jurisdiction over this action pursuant to the

3   Defend Trade Secrets Act, 18 U.S.C. § 1836 and 28 U.S.C. § 1331.

4      13.     This Court has supplemental jurisdictional over GENFIT's California state law

5   claims pursuant to 28 U.S.C. § 1367.  These state law claims derive from a common nucleus of

6   operative facts and are so related that they form part of the same case or controversy.

7      14.     This Court also has diversity subject matter jurisdiction pursuant to 28 U.S.C.

8   § 1332 because there is complete diversity of citizenship between the parties and the amount in

9   controversy exceeds $75,000.

10      15.     The Court has personal jurisdiction over Defendant CymaBay because its principal

11   place of business is in this State.

12                                    **VENUE**

13      16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant

14   CymaBay has its principal place of business in Newark, California, which is within the Northern

15   District of California, and conducts business in this District.

16      17.     Venue is also proper because a substantial part of the events or omissions giving

17   rise to the claims herein occurred in the Northern District of California, and because a substantial

18   part of the improperly obtained property that is the subject of the claims is situated in the Northern

19   District of California.  Defendant CymaBay acquired, viewed and disclosed the misappropriated

20   trade secrets in this District.  GENFIT is also informed and believes that its trade secrets reside in

21   this District on, at minimum, Defendant CymaBay's computer hardware, software and/or within

22   the knowledge of Defendant CymaBay's employees and agents.

23                          **INTRADISTRICT ASSIGNMENT**

24      18.     This is an action for trade secret misappropriation, which is a claim involving

25   Intellectual Property Rights.  Pursuant to Civil L.R. 3-2(c), this action should be assigned on a

26   district-wide basis.

27

28

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.    GENFIT And elafibranor, GENFIT's Leading Drug Candidate For Serious Liver-Related Diseases**

19.    GENFIT is a late-stage clinical biopharmaceutical company dedicated to the discovery and development of innovative drug candidates and diagnostic solutions targeting metabolic and liver-related diseases where there is considerable unmet medical need.  For over 20 years, GENFIT has been a leader in the field of nuclear receptor-based drug discovery.  Its drug discovery efforts are based on selecting appropriate nuclear receptors as targets and utilizing rational drug design to optimize its drug candidates.

20.    GENFIT's most advanced drug candidate is elafibranor, which it has spent nearly 20 years and hundreds of millions of dollars developing.  Since 2016, GENFIT had been evaluating elafibranor in a pivotal Phase 3 clinical trial as a potential treatment for nonalcoholic steatohepatitis ("NASH").  However, in May 2020 GENFIT announced that the Phase 3 clinical trial of elafibranor in NASH did not meet the predefined primary endpoint of NASH resolution without worsening of fibrosis.

21.    After undertaking a comprehensive analysis of the full interim dataset and conducting additional analyses, GENFIT decided in July 2020 to end its clinical development of elafibranor in NASH given the low probability of success compared to the required expense necessary for further development.

22.    However, elafibranor remains GENFIT's leading drug candidate to treat PBC.  PBC can result in cirrhosis and other serious liver complications that may result in the need for liver transplant.  PBC is a relatively rare disease, with a global prevalence of approximately 40 cases per 100,000.  The current market size for second line therapies in PBC is currently estimated at ~$300 million, and is expected to grow to up to $1 billion by 2025 and could reach $1.5 billion by 2035.

23.    There is currently no cure for PBC, and the two drugs currently approved for the treatment of PBC are limited because of drug intolerance, lack of patient response, and safety issues.

24.     Based on clinical data, GENFIT believes elafibranor can provide benefits for patients with PBC without significant side effects, such as the serious liver injury or death and pruritus that have been associated with approved PBC treatments.

25.     Due to its limited resources, GENFIT must decide which product candidates to pursue and the amount of resources to allocate to each, and these strategic decisions can affect the development or timing of its business prospects.  GENFIT's corporate strategy is currently focused on, among other areas, the development of elafibranor in PBC, and its business currently depends substantially on the successful development and commercialization of elafibranor.

**B.      GENFIT Diligently Protects Its Trade Secrets And Other Intellectual Property**

26.     Because GENFIT operates in the highly competitive biopharmaceutical industry, it relies on numerous measures to protect its trade secrets and other intellectual property.  Protecting its trade secrets and other intellectual property is critical to GENFIT's business, and the unauthorized disclosure of that information threatens its very viability.  For this reason, GENFIT takes all reasonable measures to guard its trade secrets, and took all such reasonable measures to protect the secrecy of the Protocol at issue here.

27.     For example, under French labor law, all employees of GENFIT are bound by its "Internal Rules of Procedure" (Règlement Intérieur).  The Internal Rules of Procedure provide in relevant part that due to GENFIT's research activities and status as a listed company, all documents and information related to its activities and economic situation, including its trade secrets, are confidential, and that all documents and materials available to employees in the course of their work are confidential and may not be disclosed to third parties external to GENFIT.  The Internal Rules of Procedure further mandate that employees must exercise the utmost discretion outside GENFIT with respect to all scientific, technical, financial, organizational or strategic information to which they are privy in the course of their work, and in particular to the extent the information relates to GENFIT and GENFIT's clients, patents, protocols and work processes and procedures. A violation of the Internal Rules of Procedure is subject to disciplinary measures, including criminal prosecution.

28.     Further, GENFIT's Code of Business Conduct and Ethics forbids employees from disclosing or distributing the company's trade secrets and other confidential information, including among other things scientific and clinical data, manufacturing, preclinical results and programs, designs, and databases, unless authorized by GENFIT or if required by law.  Employees must also return all such confidential and/or proprietary information in their possession to GENFIT at the end of their employment.

29.     In addition, GENFIT executes employment contracts with all of its employees, including employees of GENFIT and its wholly-owned U.S. subsidiary, GENFIT Corp.  These employment contracts contain confidentiality provisions that protect GENFIT's trade secrets, and which provide in relevant part that:

> Except as Employee's job duties . . . may require, Employee shall not during Employee's employment or ever after termination of employment (for whatever reason) disclose or divulge to anyone (including a prospective or future employer) in any form (including a statement to the press or in any publication authored by or at direction of or with the assistance of Employee) or forum (including Internet "chat rooms" or websites) or use any trade secrets of [GENFIT] or for a period of two (2) years after termination of employment so disclose or use any confidential business information that Employee received or developed during the course of Employee's employment relating to [GENFIT's] drugs and biomarkers candidates, research techniques and/or methodology, customer selling approaches, customer lists, customer preferences or identity of any customer, pricing structure, business process, computer programs, management information system, business or financial plans or reports, or other matters which are of a secret or confidential nature.

30.     Employees are also bound by GENFIT's "clean desk" policy, and must secure any confidential or proprietary GENFIT information (including trade secrets) in a locked cabinet at the end of each work day.  Employees similarly cannot take such information home with them without permission from a manager.  Relatedly, all documents, including the Protocol, containing confidential information are clearly marked as such.  GENFIT also maintains a color-coding system to indicate the level of secrecy attached to particular documents, and under this system the cover page of such documents must also clearly indicate who has authority to review it.

31.     GENFIT also relies on confidentiality and non-disclosure as well as intellectual property assignment agreements with its sponsored researchers, consultants, advisors, and potential collaborators.

32.     These agreements require that the other party keep secret and not disclose to third parties all trade secrets the party developed or that GENFIT made known to the party during the course of the party's relationship with GENFIT.  These agreements also require disclosure and assignment to GENFIT of ideas, developments, discoveries and inventions, including trade secrets, important to its business and vest GENFIT with exclusive ownership over all such information developed during the course of the party's relationship with GENFIT.

33.     GENFIT's policy is to require that such agreements be executed with all third parties engaged to assist with clinical trials, including the Phase 3 clinical trial being conducted under the trade secret Protocol at issue here.  For example, a standard GENFIT confidential disclosure agreement would protect the secrecy of the Protocol and GENFIT's ownership of such trade secrets by providing in relevant part as follows:

**2. Confidentiality obligation**

[Party] shall keep Confidential Information confidential and shall not disclose, distribute, publish, nor reproduce Confidential Information to any third parties, partially or fully, directly or indirectly, and in any manner whatsoever.

* * *

[Party] acknowledges that any Confidential Information of GENFIT is GENFIT's property.

**3. Use of Confidential Information**

[Party] agrees to use Confidential Information only (i) to evaluate its interest in pursuing the discussions with GENFIT, and (ii) to pursue the collaborative opportunity after the Parties have agreed to do so. [Party] agrees not to use any of the Confidential Information for any other purpose other than the Purpose unless as otherwise consented to in writing by GENFIT.

**4. Disclosure to Third Parties**

For the duration of this Agreement, [Party] agrees neither to disclose to any third party nor permit any third party to have access to any or all of the Confidential Information without GENFIT's prior written consent.

34.     These standard confidential disclosure agreements define "Confidential Information" in relevant part as "any information, which is disclosed by or on behalf of GENFIT . . ., whether directly or indirectly, in writing, orally, electronically or in any other way, and whether or not this information is mentioned or marked as confidential," including but not limited to all

information related to "the study, the study protocol, all information related to GENFIT's product, GENFIT's research programs (past, current and/or future), its protocols, its methods and procedures, its partners, vendors, providers, agents and employees, as well as its results of research, its development projects, its patents applications (current and/or future), its regulatory data or plans and all other strategic and business information relating to GENFIT's business in general."

35. Further, a standard service agreement that GENFIT will enter into with an institution and investigator for conducting its clinical trials, including the Phase 3 trial to be conducted under the Protocol, protects the secrecy of the Protocol and vests GENFIT with sole and exclusive ownership over all property related to the clinical trial, including the Protocol, and provides in relevant part as follows:

8. PROPERTY

All equipment, materials, documents, data, information and suggestions of every kind and description supplied to the Investigator or the Institution directly or indirectly by the Sponsor [*i.e.*, GENFIT] or prepared or developed by the Investigator or the Institution pursuant to the Agreement (except for Investigator or Institution procedural manuals, personnel data, and Investigator or Institution developed computer software), or resulting from the services provided hereunder shall be the sole and exclusive property of the Sponsor and be treated as Confidential Information (defined below); provided that the Investigator and Institution may retain copies of such materials as required by applicable laws, rules and regulations. The Sponsor shall have the right to make whatever use it deems desirable of any such materials, documents, data and information.

* * *

9. CONFIDENTIAL INFORMATION

The Investigator and the Institution agree that all material, documents and information provided to them by [omitted] or the Sponsor and all information developed by the Investigator or the Institution in connection with the Study for the Sponsor is and shall be considered as confidential information (collectively, the "Confidential Information") and the sole property of the Sponsor. The Investigator and the Institution agree to hold such Confidential Information in strict confidence for fifteen (15) years after the date of this Agreement and shall disclose the Confidential Information to hospital authorities, institutional review boards, and their respective agents, employees, officers and directors and representatives only on a need-to-know basis and only if foregoing parties are bound and obligated by the same provisions of confidentiality as used by the Investigator and the Institution . . . .

The Investigator and the Institution will not use any such Confidential Information for their own benefit or for the benefit of any third party, and will not furnish to any

1
2
third party any materials which incorporate any Confidential Information as otherwise herein above provided.  All obligations of confidentiality and non-use set forth in this Agreement will survive the expiration or earlier termination of this Agreement.

3
4
36.     Relatedly, standard intellectual property assignment clauses in third-party contracts GENFIT executes provide:

5
[Sample 1]:

6
7
8
All Results generated by [third party] and in the course of performing the Services shall be the sole and exclusive property of GENFIT who shall be free to use same at its discretion, and [third party] hereby assigns or otherwise transfers to GENFIT all right (including the right to use, reproduce and represent), title and interest that [third party] has or may have in and/or to such Results. . . .

9
[Sample 2]:

10
11
12
The Confidential Information imparted by or for GENFIT for the purpose of the Services shall remain GENFIT's sole property.  The hereby shall not be considered as granting the Supplier any right on the Confidential Information, or any other Intellectual Property right or title on the Confidential Information.

13
14
15
Intellectual Property Rights that are developed, generated or conceived in the performance of the Services shall be and at all times remain the sole property of GENFIT without any further compensation payable to Supplier.  No right or license is granted under this Agreement by either Party to the other party, either expressly or by implication.

16
37.     GENFIT also takes steps to protect the physical security of its premises to prevent

17
unauthorized entry, including by limiting entry into offices to those with an access key.  GENFIT

18
also protects the physical and electronic security of its information technology ("IT") systems.  For

19
example, GENFIT's IT department is entirely in-house, and it does not rely on third-party IT

20
personnel.  GENFIT also hosts its data principally on its own IT infrastructure in segregated

21
databases, and restricts access by users on a need-to-know basis through NT File System ("NTFS")

22
permissions at the request of the manager.  GENFIT also uses firewalls, anti-virus and anti-spam

23
mail software on workstations and servers, control of removable devices, and URL filtering.

24
Employees are also prohibited from using external hard drives, and may only use GENFIT's

25
authorized conferencing technology when discussing confidential or proprietary GENFIT

26
information.  Employees are regularly trained on IT risks.

27
28

1    38.    GENFIT cannot compete effectively without the ability to protect its trade secrets.

2  Its commercial success depends in large part upon trade secret protection of its current and future

3  drug and biomarker candidates and the methods used to develop and manufacture them.

4  **C.    Elafibranor Receives "Breakthrough Therapy" Designation For The Treatment Of PBC In 2019**

5

6    39.    In December 2018, GENFIT announced positive preliminary results from its Phase

7  2 clinical trial of elafibranor in PBC.

8    40.    In April 2019, the FDA granted Breakthrough Therapy designation for elafibranor

9  for the treatment of PBC based on the positive Phase 2 data.  A Breakthrough Therapy designation

10  may be granted where a drug is intended, alone or in combination with one or more other drugs,

11  to treat a serious or life-threatening disease or condition, and where preliminary clinical evidence

12  indicates that the drug may demonstrate substantial improvement over existing therapies on one

13  or more clinically significant endpoints.

14    41.    For drugs that are designated as breakthrough therapies, interaction and

15  communication between the FDA and the sponsor can help to identify the most efficient path for

16  clinical development while minimizing the number of patients placed in ineffective control

17  regimens.  The receipt of a breakthrough therapy designation does not assure faster or ultimate

18  approval by the FDA.

19    42.    In July 2019, GENFIT also received from the FDA Orphan Drug designation for

20  elafibranor for the treatment of PBC.  Under the Orphan Drug Act, the FDA may grant orphan

21  designation to a drug intended to treat a rare disease or condition, which is a disease or condition

22  that affects fewer than 200,000 individuals in the U.S. or, if it affects more than 200,000

23  individuals in the U.S., there is no reasonable expectation that the cost of developing and making

24  a drug product available in the U.S. for this type of disease or condition will be recovered from

25  sales of the product.  PBC is a relatively rare disease, with a global prevalence of approximately

26  40 cases per 100,000.  After the FDA grants orphan designation, the identity of the therapeutic

27  agent and its potential orphan use are disclosed publicly by the FDA.  Orphan designation does

28  not convey any advantage in or shorten the duration of the regulatory review and approval process.

43.     If a product that has orphan designation subsequently receives the first FDA approval for the disease or condition for which it has such designation, the product is entitled to orphan product exclusivity, which means that the FDA may not approve any other applications to market the same drug or biological product for the same indication for seven years, except in limited circumstances.  Competitors, however, may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity.

**D.     Phase 3 Clinical Trial Of elafibranor In PBC Begins In 2020**

44.     Based on the positive Phase 2 results, GENFIT launched its Phase 3 program in 2019.

45.     Clinical trials are a necessary prerequisite before any new drug therapy will be approved by regulatory authorities, including the FDA.  Clinical trials involve the administration of the drug candidate to human subjects under the supervision of qualified investigators.  Clinical trials are typically conducted in three sequential phases prior to final FDA approval:

- ***Phase 1***. Phase 1 clinical trials represent the initial introduction of a drug candidate into human subjects, frequently healthy volunteers.  In Phase 1, the drug candidate is usually tested for safety, including adverse effects, dosage tolerance, absorption, distribution, metabolism, excretion and pharmacodynamics.

- ***Phase 2***. Phase 2 clinical trials usually involve studies in a limited patient population to (1) evaluate the efficacy of the drug candidate for specific indications, (2) determine dosage tolerance and optimal dosage and (3) identify possible adverse effects and safety risks.

- ***Phase 3***. If a drug candidate is found to be potentially effective and to have an acceptable safety profile in Phase 2 clinical trials, the clinical trial program will be expanded to Phase 3 clinical trials to further demonstrate clinical efficacy, optimal dosage and safety within an expanded patient population at geographically dispersed clinical trial sites.

46.     Thus, a successful Phase 3 clinical trial is often the last major hurdle that must be cleared before final regulatory approval is granted and a new product can be marketed to the public.

47.     GENFIT often uses contract research organizations ("CROs") to assist with carrying out its clinical trials.  GENFIT also contracts with external investigators and other specialized services providers, for example with respect to certain statistical analyses, to perform

1    services such as carrying out and supervising, and collecting, analyzing, and formatting of data for

2    its trials.

3        48.     Clinical trials require significant amounts of time and capital to both design and

4    carry out, and failure can occur at any stage.  Success in early clinical trials does not ensure that

5    subsequent clinical trials will generate the same or similar results, and data obtained from trials

6    are susceptible to varying interpretations, which may delay, limit, or prevent regulatory approval.

7    For example, if the results of the Phase 3 trial evaluating elafibranor in PBC do not achieve the

8    primary efficacy endpoints or demonstrate expected safety, the prospects for approval of

9    elafibranor in PBC would be materially and adversely affected.

10        49.     Clinical trials are conducted under the guidance of protocols, which detail, among

11    other things, the objectives of the trial, the parameters to be used in monitoring safety, and the

12    effectiveness criteria to be evaluated.  Protocols are like a "recipe" or a "blueprint" – no two

13    protocols are the same.  A protocol for each clinical trial and any subsequent protocol amendments

14    must be submitted to and approved by the FDA before the trial can begin.  Each clinical trial must

15    also be reviewed and approved by an institutional review board ("IRB") at each of the sites at

16    which the trial will be conducted.  The IRB will consider, among other things, ethical factors, the

17    safety of human subjects, and the possible liability of the institution.  The particular design of a

18    clinical trial protocol is agreed to by regulatory authorities and will determine whether the results

19    of a trial will support approval of a product, and flaws in the protocol of a clinical trial may not

20    become apparent until the clinical trial is well-advanced.

21        50.     GENFIT's clinical trial protocols are proprietary and are developed by and at the

22    direction of GENFIT over the course of many months (and, as in this case, sometimes longer than

23    a year) with input from GENFIT, regulators such as the FDA, and specialist third parties (like Dr.

24    Hirschfield), including key opinion leaders in the space, who are often retained to serve as

25    investigators in trials on behalf of sponsors.

26        51.     Although GENFIT is involved in the design of the protocols for these trials and in

27    monitoring them, it uses CROs and other third parties to carry out certain stages of test

28

performance and thus relies on third parties fulfilling their contractual and regulatory obligations, including by not disclosing trade secret information entrusted to their care.

52.    It took over one year to design the trade secret Protocol at issue in this case, and it was carefully tailored based on confidential discussions with and feedback from the FDA. GENFIT began designing the Protocol in early 2019, and, based on the positive Phase 2 results, met with the FDA in September 2019 to discuss the Phase 3 program for elafibranor in PBC.  The FDA raised numerous questions regarding the design of GENFIT's Phase 3 trial, including the selection of the primary endpoint.  As explained below, "endpoints" are the study measures by which the efficacy of a drug candidate is assessed, and the primary endpoint is the most important measure of efficacy.  To address the FDA's questions, GENFIT was required to engage with external consultants – including both Dr. Hirschfield and his close colleague, a Senior Biostatistician at the Toronto Centre for Liver Disease – and to generate new data and arguments to support the design of the trial.  Over the course of the following year, GENFIT had three meetings with the FDA and defended the selection of the primary endpoint.  Eventually, the FDA accepted the design of the Protocol in June 2020, thus allowing GENFIT to initiate a Phase 3 clinical trial.  That trial, known as ELATIVE™, officially began in September 2020.  The trade secret Protocol is designed to support initial approval of elafibranor on the basis of biochemical parameters, with full approval being based upon long-term clinical events, which will take many years to accrue.  Indeed, GENFIT expects to publish topline results from the ELATIVE™ trial in the first quarter of 2023.

53.    Under the FDA's regulations, drug sponsors are required to publicly disclose limited information about their clinical trials, which information is ordinarily posted to www.ClinicalTrials.gov.   Specifically, sponsors are required to submit the following four categories of information:

1.  **Descriptive information**, including among other things: (a) the primary purpose; (b) study design; (c) primary disease or condition being studied; (d) intervention names, description, and type; (e) study start and completion date; and (f) primary and secondary outcome measures;

2.  **Recruitment information**, including among other things: (a) eligibility criteria; (b) the sex/gender of eligible participants, and (c) age limits;

3. **Location and contact information**, including among other things: (a) name of the sponsor; and (b) facility information; and

4. **Administrative data**, including among other things: (a) unique protocol identification number; (b) human subjects protection review board status; (c) record verification date; and (d) responsible party contact information.

54.     GENFIT first published this data with respect to the ELATIVE™ study on www.ClinicalTrials.gov on August 26, 2020.  As discussed further below, this was over a month *after* Dr. Hirschfield breached his fiduciary duties to GENFIT and disclosed to CymaBay the Protocol and other confidential and proprietary information related to the ELATIVE™ trial, and CymaBay first misappropriated the trade secret Protocol.

55.     However, most aspects of the trade secret Protocol are not required to be disclosed publicly, and GENFIT has not made public such aspects, including:

1. **The rationale for selecting the "randomization" ratio**. The publicly disclosed data indicate that the study will be "randomized" (*i.e.*, some patients will receive a placebo while others will receive elafibranor). However, the trade secret Protocol explains that the randomization will be "stratified" on two factors (not disclosed publicly), which data would give competitors information about specific populations of interest that may serve as the basis to perform their own analyses to support label claims. These data could allow a competitor to design their study to ensure they have data from similar populations in order to be competitive.

2. **The rationale for choosing the number of patients expected to be enrolled**. The publicly disclosed data indicate the number of patients expected to be enrolled in the ELATIVE™ study, but do not explain GENFIT's rationale for selecting the number of participants.  However, the trade secret Protocol explains the rationale and assumptions used in selecting the number of participants, including the expected response rates in the placebo and elafibranor groups that should demonstrate statistical significance between the two groups, which is an estimation of effect size. These data could allow a competitor to design their study to achieve greater differences between groups (*i.e.*, a greater effect size), thus supporting a more robust label claim and conferring a competitive advantage.

3. **"Other" secondary endpoints**. When clinical trials are designed, they pre-specify the study measures by which the efficacy of the drug is assessed, known as "endpoints."  The publicly disclosed data indicate the "primary" endpoints, which are designed to measure the most important (or primary) questions asked by the clinical trial and which are intended to support marketing authorization.  The publicly disclosed data also indicate the two key "secondary" endpoints, which could be used to support label claims. However, the trade secret Protocol discloses more than two-dozen other secondary endpoints not disclosed publicly.  It is essential to understand the trial outcomes for *all* secondary measures monitored during the study, particularly because there are circumstances where the primary outcome

measures suggest a drug is ineffective while the secondary outcome measures all indicate the drug is actually effective.  A competitor with access to these "other" secondary endpoints, including how they will be assessed, would therefore have insight into scientific strategy and could design their own trials to ensure having similar (or potentially better) data, conferring a competitive advantage.  Furthermore, there are additional and sensitive details in the trade secret Protocol pertaining to the "key" secondary endpoints, which could potentially support labeling claims by a competitor.

4. **Methods of measuring the primary and secondary endpoints**. Although, as indicated above, the publicly disclosed data indicate what the primary and "key" secondary endpoints are, they do not provide any other detail. However, the trade secret Protocol discloses the anticipated effect size and the precise methods by which the endpoints will be analyzed, including the exact tests (and the frequency thereof) that will be used to assess efficacy as well as that statistical methodology, all of which are representative of iterative discussions, correspondence, and approval by regulatory authorities such as the FDA.

5. **Patient eligibility criteria**. Although the publicly disclosed data indicate certain criteria for patient inclusion or exclusion in the study, the trade secret Protocol contains additional criteria not disclosed publicly, as well as additional details about the publicly-disclosed criteria that are not disclosed. Moreover, while patient eligibility for participation in clinical trials for a specific indication are generally comparable, there could be important differences between studies conducted by different sponsors, some of which could impart competitive advantage.  A specific example would be the mandatory requirement for patients to undergo an invasive procedure (*e.g.*, liver biopsy) to qualify for the study and as a follow-up procedure during the trial.  Patients having a choice of studies may opt for the trial without such a requirement, which may make it easier for a trial to enroll more quickly and which would be a competitive advantage.

6. **Safety monitoring**. The trade secret Protocol contains information about safety monitoring that are not disclosed publicly.  In particular, the trade secret Protocol discloses the specific types of safety events that a Data Safety Monitoring Board ("DSMB") and Clinical Event Committee ("CEC") will be monitoring during the ELATIVE™ study, all of which have been discussed with and approved by the FDA.  Thus, these data could provide a competitor valuable insight into the risk / benefit profile of its own drug candidate.  These data could in turn be a critical factor in the design of its clinical trials, in order to enable differentiation of the risk / benefit profile in the marketplace.

56.   In addition, the following information contained within the trade secret Protocol has not been made public by GENFIT (identified according to the page of the Protocol on which the information appears):

a.  Page 1:

        i.   The diagram, including footnotes, regarding the randomization scheme, duration of screening, and timing of visits, among other things.

   b.  Page 2:

        i.   The three "Secondary Objectives" listed and all of their subparts, which include testing the effect of elafibranor on several health measures.

       ii.   The then anticipated number of participating centers.

     iii.   The then anticipated number of participating countries.

   c.  Page 3:

        i.   The seventh, ninth, tenth, and eleventh inclusion criteria.

   d.  Page 5:

        i.   Information explaining the randomization process, including the factors on which the randomization will be stratified, and the minimum number of patients who must present certain effects in order to ensure inclusion of a relevant ratio of patients with substantial risk of long-term clinical outcome moderate disease stage.

   e.  Page 6:

        i.   The "Other Secondary Endpoints" that would be studied, including items one through 24 and all of their subparts.

   f.  Page 7:

        i.   The sentence beginning with "An independent DSMB will" and ending with "preserve study integrity."

   g.  Page 8:

        i.   The sentence beginning with "The CEC will" and ending with "events."

       ii.   All of the statistical considerations listed on this page, including the assumptions used in determining the patient sample size.

     iii.   All of the information about the analysis sets, including information about the (1) screened set, (2) per-protocol set, (3) safety set, and (4) pharmacokinetics set.

     iv.   All of the information related to efficacy analysis, including how the primary and secondary efficacy analyses will be performed during the DB treatment period as well as the LTE period.

   h.  Page 9:

        i.   All of the information about the safety analysis, explaining how safety analyses will be performed for both the BD treatment period and LTE period.

   i.  Page 10:

        i.   All of the information about the pharmacokinetic analysis, including the method by which it will be performed.

   j.  Pages 11–16:

        i.   All of the assessment schedules, including: (1) Table 1: Study General Assessment Schedule; (2) Table 2: Study Biological

1   Assessment Schedule; and (3) Table 3: Schedule of Patient Reported Outcomes (PROs) Questionnaires.

2   57.   The clinical trial Protocol is a trade secret that GENFIT owns because it is a

3   compilation of both public and non-public information that constitute the design of the Phase 3

4   ELATIVE™ clinical trial.  In addition, at the time of CymaBay's first act of misappropriation on

5   July 17, 2020, GENFIT's use, endorsement and adoption of every component part of the Protocol,

6   and the way in which GENFIT used such information, including in combination with other

7   components of the Protocol, had not been made public and are trade secrets.  The trade secret

8   Protocol was designed by and at the direction of GENFIT over the course of a year through the

9   ingenuity of its scientists and other personnel, material assistance from third party specialists

10   (including Dr. Hirschfield and his close colleague, a Senior Biostatistician at the Toronto Centre

11   for Liver Disease), and iterative discussions with the FDA.  GENFIT has never publicly disclosed

12   the Protocol in its entirety, and has taken all reasonable measures to protect the secrecy of the

13   Protocol, including as discussed above and more fully below.  Further, when GENFIT submits its

14   clinical trial protocols to the FDA, it does so with the understanding that they constitute trade

15   secrets and will not be improperly disclosed by the FDA.  The FDA is generally prohibited by law

16   from disclosing trade secrets that are revealed to it in carrying out its regulatory duties.

17   58.   In addition, all of the information within the Protocol that has not been made public

18   identified in Paragraphs 55 and 56 above are trade secrets that GENFIT owns.  In each element of

19   the trade secret Protocol, GENFIT explains how it would conduct its clinical trial, and GENFIT's

20   rationale for selecting each of those elements.

21   59.   It is well-understood in the biopharmaceutical industry that clinical trial protocols

22   are considered to be trade secrets that belong to drug sponsors.  As such, no sponsor would ever

23   publicly disclose its clinical trial protocols prior to the commencement of a clinical trial.  Similarly,

24   a drug sponsor would never disclose any component of its clinical trial protocol except those that

25   are required to be disclosed by FDA regulations, as discussed above.

26   60.   Such information, if it were to be made available to parties other than investigators

27   or regulatory authorities, could permit external parties to gain insight into GENFIT's development

28   plans and commercialization strategy for elafibranor in PBC and thus gain a competitive advantage

based upon this knowledge.  For example, these trade secrets enable CymaBay to significantly minimize the time-, labor-, and capital-intensive process associated with its own Phase 3 protocol, and/or provide critical information to enhance the effectiveness of CymaBay's own Phase 3 protocol and overall Phase 3 program, thus expediting the development program of seladelpar and facilitating CymaBay's discussions with the FDA.  Even more, they provide invaluable insight into the current thinking of the FDA and the criteria the FDA has considered or approved to support future registration of investigational drugs for a PBC indication.  In other words, the Protocol is a cheat-sheet for CymaBay as CymaBay seeks to develop its own drug candidate to treat PBC, allowing CymaBay to present a camera-ready dossier to the FDA and avoid time-consuming and costly back-and-forth that is often necessary to be responsive to FDA comments, and potentially accelerate its development plans.  If successful, CymaBay may be able to obtain FDA authorization for the use of seladelpar to treat PBC before GENFIT, and even if it receives FDA authorization at the same time or after GENFIT, this would significantly reduce GENFIT's ability to commercialize elafibranor.

61.    Drug candidates in later stages of clinical development generally have higher development costs than those in earlier stages of clinical development, primarily due to the increased size and duration of later-stage clinical trials.  Thus, GENFIT expects to incur significant expenses as it continues to evaluate elafibranor in PBC, particularly during the critical Phase 3 ELATIVE™ study.

62.    As explained above and further below, GENFIT's policy is to protect all information developed with respect to GENFIT's clinical trials, including the trade secret Protocol at issue here, through confidentiality and non-disclosure agreements that are specifically aimed to prevent anyone to whom the Protocol is disclosed by GENFIT from distributing it to third parties, and which also grant GENFIT exclusive ownership of all trade secret information contained in the Protocol.

1

**E.      GENFIT Enters Into Collaboration And Confidentiality Agreements With Dr. Hirschfield**

2       63.      ELATIVE™ is planned to involve 120 clinical trial sites in 15 countries and aims

3  to confirm elafibranor's previously successful results of efficacy, potential improvement in

4  pruritus, and safety in PBC patients.  To assist with the design and conduct of the ELATIVE™

5  study, GENFIT entered into a collaboration agreement on March 1, 2019 ("Collaboration

6  Agreement"), as well as a Confidential Disclosure Agreement ("CDA") on July 29, 2019, with Dr.

7  Gideon Hirschfield, one of the principal purposes of which was to protect the secrecy of the

8  Protocol.

9       64.      Dr. Hirschfield is the Director of the Autoimmune Liver Disease Programme, as

10  well as the Chair in Autoimmune Liver Disease Research, at the Toronto Centre for Liver Disease.

11  He is also a Professor of Medicine in the Division of Gastroenterology at the University of Toronto.

12  Dr. Hirschfield is a world-renowned leader in liver medicine and is a highly sought-after

13  investigator for clinical trials in PBC, and was intended to serve as the lead investigator for the

14  ELATIVE™ study, as well as a National Coordinating Investigator for Canada, Steering

15  Committee member, and advisor to GENFIT.  In selecting Dr. Hirschfield to serve in these

16  capacities, GENFIT placed in him its utmost trust and confidence to abide by his contractual and

17  fiduciary obligations to not improperly disclose to third parties confidential and proprietary

18  GENFIT information shared with him, or to promote his own interests and those of GENFIT's

19  competitors above GENFIT's interests.  GENFIT further entrusted Dr. Hirschfield and relied on

20  him to faithfully lead the ELATIVE™ clinical trial, the success of which is critical to GENFIT's

21  ability to commercialize elafibranor in PBC.

22       65.      The purpose of the collaboration agreement was to permit Dr. Hirschfield to

23  "exchange with GENFIT, in a collaborative spirit, his know-how and knowledge in the field of

24  PBC."  The terms of the collaboration agreement provided in relevant part that:

25       •   Dr. Hirschfield was required to "handle as confidential, unless otherwise
             agreed in writ[ing] with GENFIT, all information belonging to GENFIT that
26           [he] may have access [to] or generated in relation and during the
             performance of" the agreement.
27
         •   "All the data and results, including all supports generated under [the]
28           Agreement and/ or as a consequence of the Mission carried out by [Dr.

Hirschfield] shall be considered as GENFIT's exclusive property and Confidential Information."

- Dr. Hirschfield was prohibited from "disclos[ing] any of GENFIT's Confidential Information to any third party without prior written approval from GENFIT."

- All Confidential Information would remain GENFIT's property.

- "All the results generated following the expertise carried out by [Dr. Hirschfield] shall be GENFIT's exclusive property."

66. The collaboration agreement defined "Confidential Information" in relevant part as "all information belonging to GENFIT that [Dr. Hirschfield] may have access [to] or generated in relation and during the performance of" the agreement, "whether or not . . . the information is marked or designated as confidential or proprietary, whether disclosed directly or indirectly in writing, orally, electronically or by drawing or observation or by any other means."

67. Consistent with GENFIT's standard practices to protect its trade secrets and other confidential and proprietary information, the CDA with Dr. Hirschfield also contained a confidentiality provision that provided in relevant part as follows (all emphasis added):

2. **Confidentiality obligation**

Institution and ***Principal Investigator undertakes to keep Confidential Information of GENFIT secret and confidential and undertakes not to disclose, distribute, publish, nor reproduce them to any third parties***, partially or fully, directly or indirectly, and in any manner whatsoever.

…

Institution and Principal Investigator agree that ***any Confidential Information of GENFIT is GENFIT's exclusive property***.

3. **Use of Confidential Information**

Institution and Principal Investigator agree to use Confidential Information received from GENFIT only (i) to evaluate its interest in pursuing the discussions with GENFIT, and (ii) to pursue the collaborative opportunity after the Parties have agreed to do so, but not for any other purpose.

4. **Disclosure to Third Parties**

From and after the Effective Date of this Agreement, ***Institution and Principal Investigator agree neither to disclose to any third party nor permit any third party to have access to any or all of the Confidential Information disclosed by***

*GENFIT*, without its prior written consent, nor to use any of the Confidential Information for any purpose other than as consented to in writing by GENFIT.

6. **General Degree of Care**

*Institution and Principal Investigator undertake to keep Confidential Information safe . . . and agrees that it will take all reasonable measures to protect the secrecy of and to avoid disclosure or any unauthorised or fraudulent use of Confidential Information in order to prevent said information from falling into the public domain or the possession of unauthorized persons.* Institution and Principal Investigator agree to notify GENFIT in writing of any misuse or misappropriation of such Confidential Information that may come to its attention.

Without limiting the foregoing, Institution and Principal Investigator agree to use the same degree of care (and in any event not less than reasonable care) to safeguard the confidentiality of the Confidential Information that is uses to protect its own confidential information.

68.     The CDA defined "Confidential Information" in relevant part as:

*any information*, which is disclosed to Institution and Principal Investigator . . . *related to the Purpose, the Clinical Study, the Clinical Study protocol, The Clinical Study synopsis of Protocol, the Clinical Study Investigational Brochure, the Clinical Study design* including without limitation GENFIT's patients enrolment objectives, GENFIT's patients enrolment criteria (population, countries, potential clinical investigational sites, location and number, timelines), all information related to GENFIT's Product, GENFIT's research programs (past, current and/or future).

Such proprietary or confidential information may include any and all technical and non-technical information, including without limitation, information concerning financial, accounting or marketing reports, business plans, analyses, forecasts, predictions, projections, intellectual property, and know-how disclosed solely in connection with the Purpose.

69.     At all times relevant hereto, Dr. Hirschfield owed GENFIT fiduciary duties, especially a fiduciary duty not to disclose GENFIT's confidential and proprietary information as expressly agreed in the Collaboration Agreement and the CDA, and not to use such confidential information to promote his own interests or those of CymaBay over – and at the expense of – GENFIT's interests.

70.     Pursuant to the terms of the Collaboration Agreement and the CDA, as well as Dr. Hirschfield's duties as a fiduciary of GENFIT, Dr. Hirschfield obtained valuable knowledge related to GENFIT's Phase 3 development program for elafibranor in PBC as well as the ELATIVE™ study during the course of his relationship with GENFIT.  Dr. Hirschfield was a key

1 advisor to GENFIT during the year-plus that it spent designing the Protocol, and he directly
2 participated both in internal discussions at GENFIT related to the design of the Protocol, as well
3 as key meetings with the FDA related to the Protocol.  For example, on June 17, 2020, Dr.
4 Hirschfield (as well as his colleague, a Senior Biostatistician at the Toronto Centre for Liver
5 Disease) participated as an expert consultant on behalf of GENFIT in a meeting with the FDA
6 where detailed elements of the trade secret Protocol were discussed and agreed upon.

7      71.    On July 17, 2020, GENFIT provided to Dr. Hirschfield by e-mail the trade secret
8 Protocol.  The Protocol was subject to the confidentiality provisions of the CDA, and each page of
9 the Protocol was marked "CONFIDENTIAL."

10      72.    In addition to the Protocol, the July 17, 2020 e-mail relayed other confidential and
11 proprietary information belonging to GENFIT related to the ELATIVE™ trial.  The subject line
12 of the e-mail stated in relevant part: "PBC Phase 3 Study_Feasibility and Start-Up Has Resumed,"
13 and it was addressed to Dr. Hirschfield as "Dear Investigator."  The body of the July 17, 2020 e-
14 mail then explained in relevant part that GENFIT was "resuming site feasibility and start-up
15 activities for [its] GFT505B-319-1 PBC phase 3 study," that the "PBC program is proceeding
16 considering elafibranor's positive efficacy results in the PBC phase 2 study and good safety profile
17 confirmed by all clinical studies conducted to date," and that "[o]ver the past several months,
18 Genfit has worked to optimize the protocol in consultation with experts and align with current
19 regulatory thinking."

20      73.    The July 17, 2020 e-mail then further summarized the "key study changes" that
21 were reflected in the Protocol attached to the e-mail, including: (1) a modification to the duration
22 of the double-blind period of the study, which would permit the "collection of additional safety
23 and clinical outcomes data;" (2) the addition of certain inclusion criteria for patient enrollment; (3)
24 the addition of an analysis set; and (4) certain changes to the Patient Reported Outcomes.

25      74.    The July 17, 2020 e-mail from GENFIT also warned (all emphasis added):

26     This e-mail may contain confidential and/or privileged information for the sole use
    of the intended recipient.
27

28     ***Any review or distribution by anyone other than the person for whom it was
    originally intended is strictly prohibited.***

1

If you have received this e-mail in error, please contact the sender and delete all copies.

2

3

Opinions, conclusions or other information contained in this e-mail may not be that of the organization.

**F.    CymaBay Compliance Officer Dickinson Improperly Acquires The Trade Secret Protocol From Dr. Hirschfield**

4

5         75.    Just over an hour after receiving the trade secret Protocol and in breach of his

6   fiduciary duties and the express confidentiality provisions discussed above, Dr. Hirschfield

7   surreptitiously sent GENFIT's e-mail containing the trade secret Protocol and other confidential

8   and proprietary information belonging to GENFIT about its Phase 3 development program of

9   elafibranor in PBC and the ELATIVE™ study to Compliance Officer Dickinson, informing her:

10  "this was sent today to the Genfit investigators."

11        76.    CymaBay is GENFIT's most direct and key competitor, including with respect to

12  elafibranor.

13        77.    Like GENFIT, CymaBay describes itself as "a clinical-stage biopharmaceutical

14  company focused on developing and providing access to innovative therapies for patients with

15  liver and other chronic diseases with high unmet medical need."   Its lead product candidate is

16  seladelpar, a competitor to elafibranor.

17        78.    CymaBay has been seeking to develop seladelpar which – just like elafibranor – is

18  being investigated as a potential treatment for PBC, and which is a competitor to elafibranor as a

19  potentially new treatment for PBC.

20        79.    CymaBay works closely with Dr. Hirschfield, including in its own Phase 3

21  development program of seladelpar to treat PBC.   Indeed, when CymaBay announced in

22  September 2019 that its Chief Medical Officer was leaving the company, CymaBay stressed to the

23  public that Dr. Hirschfield "has been a close advisor to the company and will continue to provide

24  key medical and clinical support to CymaBay."   In a call with investors and analysts on November

25  25, 2019, Sujal Shah, CymaBay's Chief Executive Officer ("CEO"), reiterated that Dr. Hirschfield

26  is "a cholestatic disease expert and close adviser to CymaBay during our development of seladelpar

27  for PBC."   During a similar call with investors on August 3, 2020 ("August 3 Results Call"),

28

CymaBay's CEO similarly described Dr. Hirschfield as a "lead [principal investigator ("PI")]" for CymaBay.

80. Further, CymaBay has publicly claimed that Compliance Officer Dickinson's "expertise and leadership" is "integral" to CymaBay's "efforts to bring seladelpar to patients with liver diseases."

81. Seladelpar is a key part of CymaBay's strategy to save CymaBay from failure. In December 2019, CymaBay "announced a reduction in workforce of approximately 60%" as well as "additional cost cutting measures," "primarily due to results from [its] Phase 2b clinical trials from [its] studies of seladelpar in NASH." CymaBay's annual report, filed on Form 10-K with the U.S. Securities and Exchange Commission ("SEC") on March 16, 2020 ("2019 10-K"), explained in no uncertain terms that the company is struggling to survive, stating:

> To date, we have not generated any income from operations . . . [and] have an accumulated deficit of $625.9 million. . . . Further, we have terminated all of the clinical trials of seladelpar, and as a result all of our product candidates are at an early stage of development and will require additional work before they can be licensed or commercialized. Accordingly, we expect to continue to incur substantial losses from operations for the foreseeable future and there can be no assurance that we will ever generate sufficient revenue to achieve and sustain profitability.

82. CymaBay's latest annual report, filed on Form 10-K with the SEC on March 25, 2021 ("2020 10-K"), also explains that one of the "[k]ey elements of [its] strategy" is to "[a]dvance clinical development of seladelpar for patients with PBC." The 2019 and 2020 10-Ks identify elafibranor, being developed by GENFIT, as a direct competitor with seladelpar for the treatment of PBC.

83. CymaBay has struggled with its development of seladelpar. In late 2019, CymaBay "placed on hold all studies of seladelpar in subjects with PBC," including because of "initial histological observations in the Phase 2b study of seladelpar in NASH" which "were characterized by an interface hepatitis presentation, with or without biliary injury." The FDA "agreed with this decision and subsequently placed a formal clinical hold on seladelpar in December 2019." CymaBay later "terminated [its] Phase 3 and other NDA-enabling studies of seladelpar in subjects with PBC."

1    84.   In July 2020, however, the same month that CymaBay misappropriated the

2  GENFIT trade secret Protocol, the FDA lifted the clinical hold on seladelpar, allowing CymaBay

3  to resume its clinical programs in PBC, NASH, and primary sclerosing cholangitis (another liver

4  disease).

5    85.   In August 2020, CymaBay announced positive topline results from one of its

6  earlier-terminated Phase 3 studies of seladelpar in PBC, "ENHANCE," for those patients who

7  completed 12 and 26 weeks of the 52-week study.  In light of this, CymaBay, now in possession

8  of the GENFIT trade secret Protocol, announced that it had "decided to focus on reinstating the

9  clinical development program for seladelpar in PBC."

10    86.   During the August 3 Results Call, which occurred after CymaBay misappropriated

11  the Protocol and before GENFIT disclosed any portion of the Protocol as required by FDA

12  regulations, Mr. Shah, CymaBay's CEO, discussed these topline results and provided an update

13  on CymaBay's clinical development program for seladelpar, including the design of its new Phase

14  3 study and its discussions with the FDA.  Dr. Hirschfield participated in that call.  During that

15  call, Mr. Shah explained in relevant part (emphasis added): "The discussion [with the FDA] is

16  being incredibly constructive. * * * ***And I think, as it pertains to PBC, we had some important***

17  ***discussion with the agency that we'd like to still incorporate into a final study protocol before***

18  ***we share too much detail.*** * * * But I'll just generally say that these data . . . and the discussion

19  with the agency, I think, put us in an incredibly strong position to move very quickly in what I

20  believe can be an efficient and very robust new Phase III study."

21    87.   Mr. Shah explained that Dr. Hirschfield was "present for [CymaBay's]

22  teleconference" with the FDA.  Dr. Hirschfield himself elaborated about the "interactions that [he]

23  witnessed" between the FDA and CymaBay and also spoke about his experience as "an

24  investigator that's used the drug [seladelpar] in the clinic," and that he was "optimistic" and

25  "encouraged that there are sponsors who want to take on the development of breakthrough

26  therapies for patients with PBC.  And when we see the kind of data that has been shared this

27  morning, it's very exciting as an investigator and on behalf of patients to see that there should be

28  the possibility for a slick, effective and safe demonstration of new therapies."

88.     During the August 3 Results Call, Mr. Shah further explained with respect to a new Phase 3 study of seladelpar in PBC: "[A]s we finalize the overall protocol and study design, we'll share that update with you at the appropriate time."  He later reiterated: "We've continued to have very constructive dialogue with the agency.  And here, again, I think I'll reserve sharing any final details of our study until we get through submission of a protocol even to regulatory agencies." However, he said that CymaBay was "moving with high energy to incorporate these results into a protocol and doing [its] utmost to start it with haste."  Just shortly thereafter, during an August 10, 2020 earnings call, CymaBay's CEO underscored again that they were "moving quickly to finalize the design of [their new Phase 3] study [and] submit it to regulatory agencies," and that "the key will be for us in the relatively short-term to put a protocol in front of regulators.  As soon as we have any of their input or require needs for any kinds of changes to that protocol or the green light to advance, we'll put it in front of IRBs and ethics committees very quickly."

89.     Mr. Shah conceded during the August 3 Results Call that "recruiting patients in an orphan disease is challenging in and of itself, and having competition, of course, makes it even more challenging."  Dr. Hirschfield similarly explained in his own words that "there are no investigators, and there are no patients who don't underestimate how hard it is to do clinical trials and recognize the challenges of doing trials in orphan diseases across many sites in many countries."

90.     Later in August 2020, CymaBay also announced positive final results from a previously completed Phase 2 study of seladelpar in PBC.

91.     In October 2020, CymaBay reinitiated its other, previously-terminated Phase 3 study of seladelpar in PBC, "ASSURE," which is a long-term open label study.

92.     In early November 2020, CymaBay further announced that none other than Dr. Hirschfield would be delivering "a late-breaking presentation highlighting results from the ENHANCE Phase 3 study," and that it was "look[ing] forward to sharing additional results from the ENHANCE study as [they] focus on initiating a new global Phase 3 study to support the registration of seladelpar for PBC."

93.    Also in November 2020, CymaBay announced that in the third quarter and through early November 2020, it "made significant progress" in designing and "restarting the development program for seladelpar in [PBC]" and that "[s]tart-up is well underway" for a new Phase 3 trial, called "RESPONSE."  This is the exact same time period during which CymaBay misappropriated GENFIT's trade secret Protocol.  CymaBay expected its RESPONSE trial to be "poised for first patient dosed in the first quarter of" 2021.

94.    In March 2021, CymaBay similarly announced that in "the fourth quarter of 2020 and through early March 2021, [it] made significant progress reinitiating the development program for seladelpar in [PBC].  With multiple clinical sites activated, patient recruitment is underway in RESPONSE . . . . In addition, we have also initiated ASSURE, an open-label, long-term study of seladelpar in patients with PBC intended to collect additional safety data to support registration."

95.    As explained above, the trade secret Protocol would enable CymaBay to significantly minimize the time-, labor-, and capital-intensive process associated with its own Phase 3 protocol, and/or provide critical information to gain insight into GENFIT's development plans and commercialization strategy for elafibranor in PBC and enhance the effectiveness of CymaBay's own Phase 3 protocol and overall Phase 3 program, thus expediting the development program of seladelpar and facilitating CymaBay's discussions with the FDA.  Even more, it provides invaluable insight into the current thinking of the FDA and the criteria the FDA has considered or approved to support future registration of investigational drugs for a PBC indication. In other words, the Protocol is a cheat-sheet for CymaBay as CymaBay seeks to develop its own drug candidate to treat PBC, allowing CymaBay to present a camera-ready dossier to the FDA and avoid time-consuming and costly back-and-forth that is often necessary to be responsive to FDA comments, and potentially accelerate its development plans.  If successful, CymaBay may be able to obtain FDA authorization for the use of seladelpar to treat PBC before GENFIT, and even if it receives FDA authorization at the same time or after GENFIT, this would significantly reduce GENFIT's ability to commercialize elafibranor.

1

**G.      CymaBay Unlawfully Discloses The Protocol**

2        96.      Instead of refusing the trade secret Protocol and deleting it from her files as she

3   knew was required, Compliance Officer Dickinson acquired the July 17 e-mail, the Protocol and

4   other proprietary and confidential information from Dr. Hirschfield.  In so doing, and as set forth

5   below, CymaBay also aided and abetted Dr. Hirschfield's breach of fiduciary duty.

6        97.      As alleged above, and as was clear to Compliance Officer Dickinson upon receiving

7   these materials, each page of the Protocol was marked "CONFIDENTIAL."   In addition, the

8   transmittal e-mail from GENFIT to Dr. Hirschfield to which the Protocol was attached, and which

9   Compliance Officer Dickinson acquired one hour after Dr. Hirschfield received it from GENFIT,

10  warned in relevant part: "This e-mail may contain confidential and/or privileged information for

11  the sole use of the intended recipient.  Any review or distribution by anyone other than the person

12  for whom it was originally intended is strictly prohibited.  If you have received this e-mail in error,

13  please contact the sender and delete all copies."

14       98.      Compliance Officer Dickinson also knew the July 17 e-mail and Protocol was sent

15  to her in violation of Dr. Hirschfield's CDA and fiduciary duties.  This is especially true here

16  where Compliance Officer Dickinson is the CymaBay official who acquired the trade secret

17  Protocol from Dr. Hirschfield.  Compliance Officer Dickinson's job is to ensure that CymaBay

18  competes fairly and does not infringe its competitors' proprietary rights.  Moreover, Compliance

19  Officer Dickinson's role includes working closely with CymaBay's scientists, investigators, and

20  the FDA with respect to its drug development programs, giving her first-hand knowledge and

21  familiarity with clinical trials.  For instance, during the August 3 Results Call, CymaBay's CEO

22  explained that Compliance Officer Dickinson was instrumental in convincing the FDA to lift the

23  clinical hold on CymaBay, stating: "Our team worked diligently post the completion of the

24  independent expert panel review of the NASH Phase II study biopsy findings to discuss the

25  detailed analysis and conclusions of the full safety review with the FDA.  Following what was a

26  very constructive and supportive teleconference with the division, our team, led by our Chief

27  Regulatory and Compliance Officer, Klara Dickinson, worked with urgency to submit complete

28  responses to each of our 3 open INDs for seladelpar."

99.     Compliance Officer Dickinson herself explained during a May 11, 2020 earnings conference call that this process would involve "reaching out to the FDA to have a meeting with them to discuss the findings that are presented here today to orient them to what we've learned and our intention to submit the response to the clinical hold, to assure the most efficient way in which the FDA can review the information.  So during that dialogue, it will be primarily focused on addressing their safety concerns as it pertains to liver injury.  And then after the clinical hold is lifted and we're through that process, we can begin discussing with them future clinical trials as it pertains to the PBC program."  She later elaborated that this would include "summarizing the data that was actually reviewed by the . . . expert panel and reporting out the actual results of the scoring performed by doctors Kleiner, Bedossa and Goodman for their review.  It will also include the transcripts from the meeting itself, some of the dialogue that transpired and actual images, digitized histology images, and obviously, the safety data from the locked database."

100.    Accordingly, Compliance Officer Dickinson knows that biopharmaceutical companies rely on the expertise of investigators to conduct and analyze the results of clinical trials, and that investigators play a critical role in obtaining necessary regulatory approvals with respect to all phases of drug development programs.  She thus knew that in selecting Dr. Hirschfield to serve as the lead investigator for its Phase 3 trial of elafibranor in PBC, GENFIT placed in him its utmost trust and confidence to assist with its efforts to commercialize elafibranor, and that in his role as a GENFIT investigator Dr. Hirschfield not only owed fiduciary duties to GENFIT to act in GENFIT's interests, and not his own or those of GENFIT's competitors, but was also bound by strict confidentiality obligations.

101.    Indeed, and as alleged below, CymaBay relies on similar agreements to protect its trade secrets and other confidential and proprietary information, explaining in its 2019 and 2020 10-Ks that they rely "on trade secret protection and confidentiality agreements to protect [their] interests.  To this end, [they] require all . . . employees, consultants, advisors and other contractors to enter into confidentiality agreements that prohibit the disclosure of confidential information."

102.    CymaBay then further misappropriated the Protocol, including through its disclosure within CymaBay and to other parties.

103.    On or about August 27, 2020, an anonymous whistleblower sent a report concerning CymaBay's misappropriation of the Protocol to GENFIT which stated in relevant part:

> Cymabay is unethical
>
> An investigator sent the Genfit [study] synopsis and feasibility [questionnaire] to the Cymabay executive team
>
> They did not delete the message
>
> They forwarded the message to others inside and outside of Cymabay.

104.    On August 31, 2020, GENFIT, through its counsel, sent a letter to CymaBay confronting CymaBay with the whistleblower's allegations.

105.    On September 2, 2020, CymaBay, through its counsel, responded in a letter which revealed only that "an employee" of CymaBay had received the Protocol, but concealed, among other things, that this "employee" was CymaBay's Chief Regulatory and Compliance Officer, and that Dr. Hirschfield provided the Protocol to CymaBay.  Indeed, CymaBay stated to GENFIT, in relevant part, only that:

> [A]n employee of CymaBay did receive a copy of GENFIT S.A.'s ("GENFIT") feasibility questionnaire and draft protocol for its upcoming Phase 3 clinical trial of elafibranor in PBC.  No one at CymaBay solicited these materials or knew in advance they would be sent.  CymaBay is currently taking all diligent steps to delete the materials and to prevent the use of any non-public information.  Please further be advised that CymaBay has not acquired or used any other non-public GENFIT information.

106.    However, GENFIT's ongoing investigation has revealed more about the seriousness of CymaBay's misappropriation.  For example, GENFIT has learned, among other things, that:

- Dr. Hirschfield provided CymaBay with the trade secret Protocol;

- CymaBay disclosed the trade secret Protocol within the company;

- CymaBay disclosed the trade secret Protocol to certain still unidentified third parties; and

- The unidentified "employee" referenced in CymaBay's September 2, 2020 letter to whom Dr. Hirschfield sent the trade secret Protocol, and is thus where the internal disclosure at CymaBay originated, was in fact CymaBay's Chief Regulatory and Compliance Officer, Klara Dickinson.

107.   GENFIT's investigation further revealed that CymaBay's conduct as set forth above was unlawful, and was knowingly contrary to CymaBay's public Code of Business Conduct and Ethics and SEC filings.  These materials further demonstrate the importance of the trade secrets that CymaBay misappropriated from GENFIT, and the severe harm that GENFIT has suffered, and will continue to suffer without the Court's assistance.

108.   Indeed, CymaBay's Code of Business Conduct and Ethics, which includes a section on "Fair Dealing," explains (all emphasis added):

> We strive to outperform our competition fairly and honestly.  Advantages over our competitors are to be obtained through superior performance of our products and services, *not through unethical or illegal business practices*.  *Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained*, or inducing improper disclosure of confidential information from past or present employees of other companies *are prohibited*, even if motivated by an intention to advance our interests.  *If information is obtained by mistake that may constitute a trade secret or other confidential information of another business*, or if you have any questions about the legality of proposed information gathering, *you must consult your manager or the Compliance Officer*.

109.   CymaBay's Code of Business Conduct and Ethics further states that:

- One of its most important assets is its confidential information, which includes "nonpublic information that might be of use to competitors or harmful to the Company or its customers if disclosed, including, but not limited to, business, marketing and service plans, financial information, source codes, engineering and manufacturing ideas, inventions, laboratory notebooks, designs, [and] databases," and which "may be protected by patent, trademark, copyright and trade secret laws."

- Employees must take care to keep this information confidential, including by avoiding inadvertent disclosure.

110.   As a biopharmaceutical company experienced in conducting clinical trials, CymaBay thus knew that the Protocol was a highly sensitive trade secret belonging to GENFIT.

111.   CymaBay's 2019 and 2020 10-Ks recognize the fundamental role played by properly designed clinical trials, including study protocols, in the very survival of biopharmaceutical companies, warning its investors that (all emphasis added):

> Before obtaining regulatory approval for the sale of our product candidates, we must conduct additional clinical trials to demonstrate the safety and efficacy of our product candidates in humans.  Clinical testing is expensive, *difficult to design and*

*implement*, can take many years to complete and is uncertain as to outcome.  A failure of one or more of our clinical trials can occur at any stage of testing.

\* \* \*

We may experience a number of unforeseen events during clinical trials for our product candidates, including seladelpar, that could delay or prevent the commencement and/or completion of our clinical trials, including the following:

\* \* \*

• *the clinical study protocol may require one or more amendments delaying study completion*; [. . . and]

• *clinical investigators or study subjects fail to comply with clinical study protocols*[.]

112.    CymaBay also warns about the risk of "delays in reaching agreement with the FDA or other regulatory authorities on final trial design."  CymaBay cautions investors that if its clinical trials are delayed or unsuccessful for any reason, its "development costs may increase, the approval process could be delayed, any periods during which we may have the exclusive right to commercialize our product candidates may be reduced and our competitors may bring products to market before us.  Any of these events could impair our ability to generate revenues from product sales and impair our ability to generate regulatory and commercialization milestones and royalties, all of which could have a material adverse effect on our business."

113.    CymaBay further recognizes that its success depends in large part on its ability to protect its trade secrets and other intellectual property rights, including by *not infringing other's proprietary rights*, explaining in its 2019 and 2020 10-Ks (all emphasis added):

We . . . rely on trade secrets, know-how, continuing technological innovation and in-licensing to develop and maintain our proprietary position.  Our success depends in part on our ability to obtain, maintain and enforce proprietary protection for our product candidates, technology and know-how, *to operate without infringing the proprietary rights of others*, and to exclude others from infringing our proprietary rights. \* \* \*

We also depend upon the skills, knowledge, experience and know-how of our management, research and development personnel, as well as that of our advisors, consultants and other contractors.  To help protect our proprietary know-how, which is not patentable, and for inventions for which patents may be difficult to enforce, we currently rely, and will in the future rely, on trade secret protection and confidentiality agreements to protect our interests.  To this end, *we require all of our employees, consultants, advisors and other contractors to enter into*

1

*confidentiality agreements that prohibit the disclosure of confidential information*.

2

3

114.    Another portion of its 2019 and 2020 10-Ks concedes that (all emphasis added):

4

We face the risk of potential ***unauthorized disclosure or misappropriation of our confidential information***, including our intellectual property, by [contract service providers (CSPs)], which ***may reduce our trade secret protection and allow our potential competitors to access and exploit our proprietary technology***, among other things.  If our CSPs do not successfully carry out their contractual duties or obligations, fail to meet expected deadlines, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for any other reasons, our clinical trials may be extended, delayed or terminated, and we may not be able to obtain regulatory approval for, or successfully commercialize our product candidates.  ***As a result, our financial results and the commercial prospects for our product candidates that we develop would be harmed, our costs could increase, and our ability to generate revenues could be delayed***.

5

6

7

8

9

10

11

115.    Contrary to these statements and its purported commitment to "fair dealing" and

12

confidentiality in its Code of Business Conduct and Ethics, CymaBay – and its Chief Regulatory

13

and Compliance Officer – misappropriated GENFIT's trade secrets and disclosed them within

14

CymaBay and to third parties, as discussed above.

15

**H.     CymaBay Refuses To Come Clean To, And Cooperate With, GENFIT**

16

116.    Throughout September and October 2020, GENFIT, through its counsel,

17

communicated with CymaBay, through its counsel.  During such communications, GENFIT

18

sought further information about CymaBay's misappropriation of the trade secret Protocol.  For

19

example, GENFIT sought additional information regarding who received the trade secret Protocol,

20

whether CymaBay or other parties used the trade secret Protocol, and whether CymaBay had

21

destroyed the trade secret Protocol and otherwise eliminated CymaBay's ability to benefit from

22

the trade secret Protocol.

23

117.    CymaBay, however, refused to provide such additional information.  CymaBay also

24

refused GENFIT's request that CymaBay retain an independent audit firm to: (a) investigate

25

CymaBay's misappropriation; (b) assess whether CymaBay had destroyed the trade secret Protocol

26

and otherwise eliminated CymaBay's ability to benefit from the trade secret Protocol; and (c)

27

determine whether, and to what extent, CymaBay or any other third parties may have improperly

28

used GENFIT's trade secrets.

1  118.   CymaBay rejected GENFIT's proposal on the purported grounds that CymaBay

2  would be unable to control the auditor, the audit would not be privileged, and CymaBay expressed

3  concern that the auditor could provide GENFIT with CymaBay's confidential information.

4  GENFIT assured CymaBay that GENFIT would scope the audit to avoid disclosure of any such

5  confidential information.

6  119.   Nevertheless, CymaBay continued to refuse GENFIT's audit request or to provide

7  GENFIT with additional information.  CymaBay instead proposed hiring only an e-discovery

8  vendor who would certify that CymaBay does not have GENFIT's trade secret information on its

9  IT systems.  CymaBay, however, refused to allow an audit which included anything further, and

10  not even an examination of the most critical issues, including: (a) the identity of the third parties

11  to whom CymaBay disclosed the trade secret Protocol; (b) what portion(s) of the trade secret

12  Protocol were disclosed; (c) how and when they disclosed the trade secret Protocol; (d) the purpose

13  for which CymaBay disclosed the trade secret Protocol, including any purpose involving efforts

14  to harm or otherwise damage GENFIT; and (e) the extent to which CymaBay or any other third

15  parties have improperly used GENFIT's trade secrets.

16  120.   Upon information and belief, CymaBay continues to possess GENFIT's trade

17  secrets, including the Protocol.

18
**FIRST CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*)**
19

20  121.   GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1

21  through 120 as though fully set forth herein.

22  122.   The information described above, including the Protocol, constitute "trade secrets"

23  within the meaning of 18 U.S.C. § 1839 that relate to products or services used, sold, purchased,

24  or transported, or intended for use, sale, purchase, or transport in interstate commerce.

25  123.   GENFIT is the owner of the trade secrets described herein.

26  124.   The trade secrets described herein derive independent value, both actual and

27  potential, from not being generally known to and not being readily ascertainable through proper

28

1  means by GENFIT's competitors, including CymaBay, or to other third parties who might obtain

2  economic value from their disclosure or use.

3     125.   At all times relevant herein, GENFIT has taken the above-described reasonable

4  measures to protect the secrecy of its trade secrets, including that which Defendants have

5  misappropriated.

6     126.   Defendants misappropriated GENFIT's trade secrets within the meaning of 18

7  U.S.C. § 1839 by acquiring the trade secrets while knowing or having reason to know that the trade

8  secrets were acquired by improper means, including but not limited to, through misrepresentation

9  or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade

10  secrets, and by disclosing or using the trade secrets without GENFIT's express or implied consent.

11     127.   Defendants have failed to return the trade secrets that they misappropriated to

12  GENFIT.

13     128.   Upon information and belief, Defendants still possess and use GENFIT's trade

14  secrets to compete with/or otherwise harm GENFIT.

15     129.   Defendants' misappropriation proximately caused damages to GENFIT, including

16  but not limited to, loss of profits, goodwill, competitive advantage and business opportunities, in

17  an amount to be determined at trial.

18     130.   Defendants have been unjustly enriched as a further proximate result of their

19  misappropriation of GENFIT's trade secrets.

20     131.   Defendants' actions in misappropriating GENFIT's trade secrets were willful and

21  malicious, and done with the intent to injure GENFIT and improve Defendants' own economic

22  opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18

23  U.S.C. § 1836(b)(3)(C).

24     132.   GENFIT's damages cannot be compensated through remedies at law alone.

25  GENFIT is therefore entitled to temporary, preliminary and permanent injunctive relief to protect

26  the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing

27  GENFIT's trade secrets, requiring Defendants to submit to a third-party audit to determine the

28  extent of Defendants' past use and disclosure, requiring Defendants to turn over any and all copies

of GENFIT's trade secrets to GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

**SECOND CAUSE OF ACTION**
**Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426, *et seq.*)**

133.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 132 as though fully set forth herein.

134.    The information described above, including the Protocol, constitute "trade secrets" within the meaning of Cal. Civ. Code § 3426.1.

135.    GENFIT is the owner of the trade secrets described herein.

136.    The trade secrets described herein derive independent value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by GENFIT's competitors, including CymaBay, or to other third parties who might obtain economic value from their disclosure or use.

137.    At all times relevant herein, GENFIT has taken the above-described reasonable measures to protect the secrecy of its trade secrets, including that which Defendants have misappropriated.

138.    Defendants misappropriated GENFIT's trade secrets within the meaning of Cal. Civ. Code § 3426.1 by acquiring the trade secrets while knowing or having reason to know that the trade secrets were acquired by improper means, including but not limited to, through misrepresentation or breach of the duty to maintain the secrecy of the trade secrets or to limit the use of the trade secrets, and by disclosing or using the trade secrets without GENFIT's express or implied consent.

139.    Defendants have failed to return the trade secrets that they misappropriated to GENFIT.

140.    Upon information and belief, Defendants still possess and use GENFIT's trade secrets to compete with/or otherwise harm GENFIT.

141.    Defendants' misappropriation proximately caused damages to GENFIT, including but not limited to, loss of profits, goodwill, competitive advantage and business opportunities, in an amount to be determined at trial.

142.    Defendants have been unjustly enriched as a further proximate result of their misappropriation of GENFIT's trade secrets.

143.    Defendants' actions in misappropriating GENFIT's trade secrets were willful and malicious, and done with the intent to injure GENFIT and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to Cal. Civ. Code § 3426.3.

144.    GENFIT's damages cannot be compensated through remedies at law alone. GENFIT is therefore entitled to temporary, preliminary and permanent injunctive relief to protect the use and disclosure of its trade secrets by enjoining Defendants from using or disclosing GENFIT's trade secrets, requiring Defendants to submit to a third-party audit to determine the extent of Defendants' past use and disclosure, requiring Defendants to turn over any and all copies of GENFIT's trade secrets to GENFIT, and requiring Defendants to disclose the third parties to whom they have disclosed the trade secrets.

## THIRD CAUSE OF ACTION
### Intentional Interference with Prospective Economic Advantage

145.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1 through 144 as though fully set forth herein.   To the extent such allegations include the misappropriation of trade secrets, those trade secret allegations are not incorporated here unless the court finds that such matters do not constitute trade secrets.  If the court makes such a finding, GENFIT reserves its right to seek judicial review, but such allegations will then be incorporated here as involving GENFIT's confidential and proprietary information.  Otherwise, this claim is not predicated on the misappropriation of trade secrets owned by GENFIT.

146.    CymaBay tortiously interfered with GENFIT's prospective economic advantage.

147.    GENFIT had a reasonable expectation that, following the successful completion and positive results of the ELATIVE™ clinical trial, it would market elafibranor to patients

1   suffering from PBC.  PBC is a rare disease with low prevalence and, as a result, has been

2   recognized as an "orphan disease" by the FDA.  Accordingly, it is a well-defined market.  GENFIT

3   would derive substantial economic advantage from being able to market elafibranor to this market,

4   where the value of second line therapies like elafibranor could reach $1.5 billion in the near future.

5        148.    CymaBay knows that GENFIT plans to introduce elafibranor into the market for

6   the treatment of PBC upon successful completion of the ELATIVE™ trial, including based on its

7   public disclosures as set forth above.

8        149.    Moreover, GENFIT had an existing economic relationship with Dr. Hirschfield, as

9   well as the Toronto Centre for Liver Disease and the University of Toronto with which he is

10  affiliated, because Dr. Hirschfield had served as an investigator for GENFIT's Phase 2 clinical

11  trial of elafibranor in PBC.  CymaBay knew that Dr. Hirschfield served as an investigator for its

12  Phase 2 study of elafibranor in PBC.  Data from that study were presented in April 2019 at the

13  European Association for the Study of Liver's ("EASL") International Liver Congress, the EASL's

14  annual meeting, and Dr. Hirschfield was listed as a co-author of the presentation.  Further,

15  CymaBay has issued sworn statements that it is aware of and reviews medical literature in the field

16  of PBC, including information disclosed by its competitors, and that it has relied on its

17  competitors' PBC clinical trials in designing its own.  Upon information and belief, CymaBay also

18  knew about Dr. Hirschfield's relationship with GENFIT since key opinion leaders are required to

19  disclose conflicts of interest.

20       150.    GENFIT also had an existing economic relationship with Dr. Hirschfield, the

21  Toronto Centre for Liver Disease, and the University of Toronto because Dr. Hirschfield had

22  agreed to serve as lead investigator for the ELATIVE™ Phase 3 trial.  CymaBay similarly knew

23  about this relationship because it received the July 17, 2020 e-mail directly from Dr. Hirschfield,

24  which was sent to him by GENFIT and addressed to him as "Dear Investigator," and attached the

25  Protocol and further disclosed other confidential developments with respect to the Phase 3 trial.

26       151.    GENFIT's relationship with Dr. Hirschfield contained the probability of future

27  economic benefit to GENFIT because Dr. Hirschfield is a world-renowned, highly sought-after,

28  and experienced clinician-scientist with extensive experience leading and conducting all stages of

clinical trials, including in particular for drugs intended to treat PBC.  In addition, the ability to use the University of Toronto as one of the sites where the clinical trial would be conducted, and to collaborate with other experts at the Toronto Centre for Liver Disease (like Dr. Hirschfield's close colleague, a Senior Biostatistician there), would give access to a diverse and robust patient population.  Together, these factors would mean that the Phase 3 clinical trial would be able to enroll patients as quickly as possible, that the patient population would be diverse, and that the clinical trial would be led by one of the world's preeminent doctors in the field of liver-related diseases, all of which would significantly increase the chance of a timely and efficacious clinical trial and, ultimately, FDA approval.  In turn, this would enhance GENFIT's ability to introduce elafibranor into the market of patients who suffer from PBC and thus commercialize elafibranor.

152.    Indeed, the particular sites where a clinical trial is conducted are critical to its overall success, and locating, evaluating, and choosing appropriate sites is a difficult and lengthy process for any clinical trial.  For example, during a November 5, 2020 earnings call, CymaBay's CEO was asked specifically about comparisons between the design of CymaBay's RESPONSE trial and GENFIT's ELATIVE™ trial.  He responded that "before really making any sort of comparison to GENFIT['s] study design[,] I'd simply say that the experience we've had, the ongoing dialogue we've had with the [FDA] really are the key parameters in which we think RESPONSE is designed," but that "having observed what [GENFIT had] put out in terms of their study design on [www.ClinicalTrials.gov], it's also a 2:1 randomization, single dose versus placebo."  He also explained: "We don't know GENFIT's very specific sites, [but] we would expect that there would be some overlap, that['s] common at centers that are seeing patients with PBC," and that CymaBay's experience with its early-terminated Phase 3 ENHANCE study, including a "significant number of sites with a lot of experience with seladelpar in the setting of PBC, . . . [is] really key."

153.    During a March 25, 2021 earnings call with investors, CymaBay's CEO also explained that "many . . . don't quite appreciate the fact that when you finally have a protocol for a global study, there's a lot of leg work before you start getting patients into screening and ultimately to randomization," and that "all geographies are a key step in getting sites informed as

1   well as ultimately activated." During the March 25, 2021 earnings call, CymaBay's CEO

2   underscored in particular that "[i]n a setting like PBC, we typically see between 1 to 2 patients per

3   site. There are some sites we consider super enrollers with 4 or 5 patients. Of course, there are

4   some sites that ultimately are not able to enroll patients. These just don't meet the enrollment

5   criteria for this type of study."

6   154.   During the November 5, 2020 earning call, Charles McWherter, CymaBay's Chief

7   Scientific Officer, explained that "having been through this before, there's things that we know

8   about how to train and help sites to find patients who are going to qualify, how to avoid those

9   screen failures. * * * And then we had many sites who did so well. It enrolled so well, and those

10  are the sites that we know to bring back. But it's not like every relationship was a success story.

11  We had sites that we activated, and for a variety of reasons, maybe sometimes they just didn't have

12  the patients, maybe they were distracted with other -- maybe they didn't have the staff to support

13  it for a lot of reasons. We know now where not to go back to, and we know where to go back to.

14  If you follow my meaning." During the March 25, 2021 earnings call, CymaBay's CEO reiterated

15  that knowing which sites can enroll PBC patients and which cannot "gives [CymaBay] a little bit

16  of advantage to just know some of the additional centers that we want to ultimately target."

17  155.   CymaBay interfered with and disrupted this relationship by acquiring from Dr.

18  Hirschfield the Protocol as well as the confidential and proprietary information set forth above

19  related to GENFIT's Phase 3 ELATIVE™ trial while he was an investigator of GENFIT and under

20  an obligation to keep it secret. At least given CymaBay's own expertise with clinical trials and

21  investigators as discussed above, CymaBay knew that GENFIT and Dr. Hirschfield would have

22  no choice but to terminate their relationship following this serious breach of trust. As a result,

23  GENFIT lost its ability to work with Dr. Hirschfield, to use the University of Toronto as a clinical

24  trial site, and to work with other experts at the Toronto Centre for Liver Disease. Relatedly,

25  GENFIT lost the symbiosis that had developed over the course of more than a year as GENFIT

26  and Dr. Hirschfield together worked to design the Protocol, and Dr. Hirschfield prepared to serve

27  as lead investigator. GENFIT's investments in Dr. Hirschfield, as well as the momentum that had

28  been built during this time, ultimately came to naught and GENFIT was required, just as the Phase

1  3 trial was about to begin, to pivot and locate a new lead investigator and bring them up to speed
2  in an incredibly short period of time.  Similarly, GENFIT was required to focus its attention and
3  resources on identifying potential sites other than the University of Toronto for its Phase 3 trial, as
4  well as new investigators and a National Coordinating Investigator for Canada, to ensure it had
5  adequate representation of sites in Canada to ensure overall study enrollment.  It thus lost the
6  knowledge and expertise of one of the world's most renowned and sought-after investigators for
7  drugs intended to treat liver-related diseases (as well as those he was closely affiliated with), the
8  ability to enroll patients at an important site (including the time and resources that had been spent
9  evaluating that site), and its year-plus investment with Dr. Hirschfield as a principal advisor, thus
10 disrupting its overall Phase 3 clinical trial and potentially adversely affecting its ability to
11 commercialize elafibranor.

12      156.    CymaBay's actions as set forth above have disrupted GENFIT's ELATIVE™ trial,
13 regulatory efforts, and commercialization of its products.

14      157.    As a direct and proximate result of CymaBay's actions as set forth above, GENFIT
15 has been harmed by losing its lead investigator, a valuable site for the conduct of the clinical trial,
16 its ability to work with other experts at the Toronto Centre for Liver Disease, the loss of its
17 investment in Dr. Hirschfield, and the time and expense necessary in locating alternative trial sites,
18 a new lead investigator, and additional investigators as well as a National Coordinating
19 Investigator in Canada just before the ELATIVE™ trial was about to begin, as well as the
20 disruption of GENFIT's ELATIVE™ trial, regulatory efforts, and commercialization of its
21 products.

22      158.    As a direct and proximate result of Defendants' actions as set forth above, GENFIT
23 has been harmed in an amount to be determined at trial.

24      159.    The above-recited actions of Defendants were done with malice, fraud, oppression,
25 and reckless disregard of the above described rights of GENFIT and within the meaning of
26 California Civil Code § 3294.  Therefore, GENFIT is entitled to recover punitive damages against
27 Defendants.

28

1

**FOURTH CAUSE OF ACTION**
**Negligent Interference with Prospective Economic Advantage**

2      160.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1

3  through 159 as though fully set forth herein.   To the extent such allegations include the

4  misappropriation of trade secrets, those trade secret allegations are not incorporated here unless

5  the court finds that such matters do not constitute trade secrets.  If the court makes such a finding,

6  GENFIT reserves its right to seek judicial review, but such allegations will then be incorporated

7  here as involving GENFIT's confidential and proprietary information.  Otherwise, this claim is not

8  predicated on the misappropriation of trade secrets owned by GENFIT.

9      161.    CymaBay tortiously interfered with GENFIT's prospective economic advantage.

10     162.    GENFIT had a reasonable expectation that, following the successful completion

11  and positive results of the ELATIVE™ clinical trial, it would market elafibranor to patients

12  suffering from PBC.  PBC is a rare disease with low prevalence and, as a result, has been

13  recognized as an "orphan disease" by the FDA.  Accordingly, it is a well-defined market.  GENFIT

14  would derive substantial economic advantage from being able to market elafibranor to this market,

15  where the value of second line therapies like elafibranor could reach $1.5 billion in the near future.

16     163.    CymaBay knows that GENFIT plans to introduce elafibranor into the market for

17  the treatment of PBC upon successful completion of the ELATIVE™ trial, including based on its

18  public disclosures as set forth above.

19     164.    Moreover, GENFIT had an existing economic relationship with Dr. Hirschfield, as

20  well as the Toronto Centre for Liver Disease and the University of Toronto with which he is

21  affiliated, because Dr. Hirschfield had served as an investigator for GENFIT's Phase 2 clinical

22  trial of elafibranor in PBC.  CymaBay knew that Dr. Hirschfield served as an investigator for its

23  Phase 2 study of elafibranor in PBC.  Data from that study were presented in April 2019 at the

24  European Association for the Study of Liver's ("EASL") International Liver Congress, the EASL's

25  annual meeting, and Dr. Hirschfield was listed as a co-author of the presentation.   Further,

26  CymaBay has issued sworn statements that it is aware of and reviews medical literature in the field

27  of PBC, including information disclosed by its competitors, and that it has relied on its

28  competitors' PBC clinical trials in designing its own.  Upon information and belief, CymaBay also

knew about Dr. Hirschfield's relationship with GENFIT since key opinion leaders are required to disclose conflicts of interest.

165.    GENFIT also had an existing economic relationship with Dr. Hirschfield, the Toronto Centre for Liver Disease, and the University of Toronto because Dr. Hirschfield had agreed to serve as lead investigator for the ELATIVE™ Phase 3 trial.  CymaBay similarly knew about this relationship because it received the July 17, 2020 e-mail directly from Dr. Hirschfield, which was sent to him by GENFIT and addressed to him as "Dear Investigator," and attached the Protocol and further disclosed other confidential developments with respect to the Phase 3 trial.

166.    GENFIT's relationship with Dr. Hirschfield contained the probability of future economic benefit to GENFIT because Dr. Hirschfield is a world-renowned, highly sought-after, and experienced clinician-scientist with extensive experience leading and conducting all stages of clinical trials, including in particular for drugs intended to treat PBC.  In addition, the ability to use the University of Toronto as one of the sites where the clinical trial would be conducted, and to collaborate with other experts at the Toronto Centre for Liver Disease (like Dr. Hirschfield's close colleague, a Senior Biostatistician there), would give access to a diverse and robust patient population.  Together, these factors would mean that the Phase 3 clinical trial would be able to enroll patients as quickly as possible, that the patient population would be diverse, and that the clinical trial would be led by one of the world's preeminent doctors in the field of liver-related diseases, all of which would significantly increase the chance of a timely and efficacious clinical trial and, ultimately, FDA approval.  In turn, this would enhance GENFIT's ability to introduce elafibranor into the market of patients who suffer from PBC and thus commercialize elafibranor.  As set forth above, the particular sites where a clinical trial is conducted are critical to its overall success, and locating, evaluating, and choosing appropriate sites is a difficult and lengthy process for any clinical trial.

167.    CymaBay interfered with and disrupted this relationship by acquiring from Dr. Hirschfield the Protocol as well as the confidential and proprietary information set forth above related to GENFIT's Phase 3 ELATIVE™ trial while he was an investigator of GENFIT and under an obligation to keep it secret.  At least given CymaBay's own expertise with clinical trials and

investigators as discussed above, CymaBay knew that GENFIT and Dr. Hirschfield would have no choice but to terminate their relationship following this serious breach of trust.  As a result, GENFIT lost its ability to work with Dr. Hirschfield, to use the University of Toronto as a clinical trial site, and to work with other experts at the Toronto Centre for Liver Disease. Relatedly, GENFIT lost the symbiosis that had developed over the course of more than a year as GENFIT and Dr. Hirschfield together worked to design the Protocol, and Dr. Hirschfield prepared to serve as lead investigator.  GENFIT's investments in Dr. Hirschfield, as well as the momentum that had been built during this time, ultimately came to naught and GENFIT was required, just as the Phase 3 trial was about to begin, to pivot and locate a new lead investigator and bring them up to speed in an incredibly short period of time.  Similarly, GENFIT was required to focus its attention and resources on identifying potential sites other than the University of Toronto for its Phase 3 trial, as well as new investigators and a National Coordinating Investigator for Canada, to ensure it had adequate representation of sites in Canada to ensure overall study enrollment.  It thus lost the knowledge and expertise of one of the world's most renowned and sought-after investigators for drugs intended to treat liver-related diseases (as well as those he was closely affiliated with), the ability to enroll patients at an important site (including the time and resources that had been spent evaluating that site), and its year-plus investment with Dr. Hirschfield as a principal advisor, thus disrupting its overall Phase 3 clinical trial and potentially adversely affecting its ability to commercialize elafibranor.

168.    CymaBay's actions as set forth above have disrupted GENFIT's ELATIVE™ trial, regulatory efforts, and commercialization of its products.

169.    As a direct and proximate result of CymaBay's actions as set forth above, GENFIT has been harmed by losing its lead investigator, a valuable site for the conduct of the clinical trial, its ability to work with other experts at the Toronto Centre for Liver Disease, the loss of its investment in Dr. Hirschfield, and the time and expense necessary in locating alternative trial sites, a new lead investigator, and additional investigators as well as a National Coordinating Investigator in Canada just before the ELATIVE™ trial was about to begin, as well as the

1  disruption of GENFIT's ELATIVE™ trial, regulatory efforts, and commercialization of its
2  products.

3      170.    CymaBay also owed GENFIT a duty of reasonable care not to violate federal and
4  state trade secret laws, to aid and abet Dr. Hirschfield's breach of fiduciary duty, and because
5  CymaBay and GENFIT were both – as CymaBay well knew – dependent on each other to interact
6  properly with Dr. Hirschfield.  Indeed, as discussed above, at the same time Dr. Hirschfield was
7  GENFIT's lead investigator, Dr. Hirschfield was also CymaBay's lead investigator with respect
8  to seladelpar as a treatment for PBC.  Thus, because CymaBay knew that Dr. Hirschfield was
9  simultaneously serving as an advisor to and investigator for both CymaBay and GENFIT for their
10  respective Phase 3 development programs related to PBC, CymaBay owed a duty of care to
11  GENFIT not to improperly interact with Dr. Hirschfield.  CymaBay further knew or should have
12  known that its failure to act with due care might interfere with GENFIT's relationships as set forth
13  above and cause GENFIT to lose the probable future economic benefit of those relationships.

14      171.    Defendants failed to act with reasonable care by misappropriating GENFIT's trade
15  secrets, acquiring other GENFIT proprietary and confidential information, and interfering with
16  GENFIT's relationship with Dr. Hirschfield, the Toronto Centre for Liver Disease, and the
17  University of Toronto.

18      172.    As a direct and proximate result of Defendants' actions as set forth above, GENFIT
19  has been harmed in an amount to be determined at trial.

20      173.    The above-recited actions of Defendants were done with malice, fraud, oppression,
21  and reckless disregard of the above described rights of GENFIT and within the meaning of
22  California Civil Code § 3294.  Therefore, GENFIT is entitled to recover punitive damages against
23  Defendants.

**FIFTH CAUSE OF ACTION**
**Aiding and Abetting Breach of Fiduciary Duty**

26      174.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1
27  through 173 as though fully set forth herein.  To the extent such allegations include the
28  misappropriation of trade secrets, those trade secret allegations are not incorporated here unless

1   the court finds that such matters do not constitute trade secrets.  If the court makes such a finding,

2   GENFIT reserves its right to seek judicial review, but such allegations will then be incorporated

3   here as involving GENFIT's confidential and proprietary information.  Otherwise, this claim is not

4   predicated on the misappropriation of trade secrets owned by GENFIT.

5        175.    At all times relevant hereto, Dr. Hirschfield was a fiduciary of GENFIT.  GENFIT

6   selected Dr. Hirschfield to serve as the lead investigator for the ELATIVE™ trial in light of his

7   prior involvement with GENFIT's Phase 2 clinical trial of elafibranor in PBC, as well as the fact

8   that he is widely regarded as one of the world's top scientists in the field of liver-related diseases

9   with extensive experience in conducting and leading clinical trials, particularly for drugs intended

10  to treat PBC.

11       176.    As the lead investigator for the ELATIVE™ trial, GENFIT entrusted Dr.

12  Hirschfield with its trade secrets and other confidential and proprietary information, including the

13  Protocol, and with the responsibility of timely, safely, and efficaciously leading the ELATIVE™

14  trial in accordance with the Protocol.  GENFIT further entrusted Dr. Hirschfield to at all times

15  maintain the confidentiality of all information related to the trial, in accordance with the terms of

16  the Collaboration Agreement and the CDA, and not to promote his own interests and those of

17  CymaBay's over – and at the expense of – GENFIT's interests.

18       177.    Accordingly, Dr. Hirschfield owed fiduciary duties to GENFIT, including to keep

19  secret and confidential all information relating to GENFIT's development program of elafibranor

20  in PBC and GENFIT's Phase 3 ELATIVE™ trial that Dr. Hirschfield acquired during the course

21  of his relationship with GENFIT.

22       178.    Dr. Hirschfield breached his fiduciary duties by:

23       a.    Disclosing to CymaBay key developments in the timeline of GENFIT's Phase 3

24            program of elafibranor in PBC that had not been made public by GENFIT by July

25            17, 2020, including the fact that: (a) GENFIT had a Protocol in existence that had

26            been refined over the course of "several months," including through discussions

27            with experts and the FDA such that it was "align[ed] with current regulatory

28            thinking;" (b) GENFIT had in place investigators to assist with conducting the

ELATIVE™ trial; (c) GENFIT had selected Dr. Hirschfield to serve as lead investigator; and (d), at that time, site feasibility and start-up activities for the Phase 3 trial had resumed;

b.  Providing the Protocol to CymaBay, no portion of which had been made public by July 17, 2020;

c.  Promoting his own interests and those of CymaBay's over, and at the expense of, GENFIT's interests.  For instance, when providing the July 17, 2020 e-mail to CymaBay, Dr. Hirschfield sought to bolster and promote his own standing, reputation and value to CymaBay, and in turn, CymaBay's business.  Doing so was important to Dr. Hirschfield, at least given Dr. Hirschfield's commercial relationship with CymaBay, and potential for future business with CymaBay. Helping CymaBay compete with GENFIT, including with GENFIT's own confidential information and while serving as GENFIT's lead investigator, is a clear-cut breach of fiduciary duty; and

d.  Subsequent to his disclosure on July 17, 2020, engaging in further communications with CymaBay related to, and involving, the July 17, 2020 e-mail and GENFIT's confidential and proprietary information.

179.    CymaBay knew when it acquired the July 17 e-mail, including the Protocol attached thereto and the other confidential and proprietary GENFIT information contained therein, that Dr. Hirschfield was a fiduciary of GENFIT, and breached his fiduciary duties.  The e-mail was addressed to Dr. Hirschfield as "Dear Investigator," and Dr. Hirschfield made clear therein to Compliance Officer Dickinson that he was among "the Genfit investigators" who received from GENFIT the e-mail and Protocol.

180.    Moreover, each page of the Protocol was marked "CONFIDENTIAL," and the body of the e-mail itself warned that it may contain confidential and/or privileged information for the sole use of the intended recipient, and that any review by anyone else was "strictly prohibited."

181.    Further, Compliance Officer Dickinson and CymaBay had first-hand familiarity with clinical trials and coordinated closely with CymaBay's investigators on its clinical trial

1   programs, including in discussions with the FDA.  Compliance Officer Dickinson knows that
2   clinical trial investigators owe fiduciary duties to drug sponsors and are subject to strict
3   confidentiality agreements that prevent them from disclosing all confidential information
4   belonging to a drug sponsor related to its clinical trials.

5       182.    In addition, when CymaBay improperly acquired the July 17 e-mail and the trade
6   secret Protocol, CymaBay knew that GENFIT had not yet publicly disclosed the key developments
7   or milestones with respect to its Phase 3 program for elafibranor in PBC set forth above.  Therefore,
8   CymaBay knew that none of the information contained in Dr. Hirschfield's e-mail or attached
9   thereto, including the Protocol, had been made public by GENFIT.

10      183.    For example, prior to July 17, 2020, GENFIT had not publicly disclosed key
11  information about its Phase 3 trial, including: (a) what progress GENFIT had made in designing
12  its Phase 3 trial, including whether its clinical trial Protocol reflected any discussions with the
13  FDA; (b) whether GENFIT had selected investigators for the trial; and (c) any other information
14  regarding the design, development, initiation, and progress of any Phase 3 trial.

15      184.    Moreover, and as discussed above, it was not until August 26, 2020 that GENFIT
16  disclosed certain portions of the Protocol as required by FDA regulations.  And it was not until
17  September 24, 2020 that GENFIT publicly disclosed that the first patient had made their first visit
18  for the ELATIVE™ trial.

19      185.    CymaBay provided substantial assistance and encouragement to Dr. Hirschfield's
20  breach of fiduciary duty, at least when CymaBay accepted Dr. Hirschfield's July 17 e-mail, opened
21  it, reviewed it, and disseminated it and/or its contents internally and to third parties, all without
22  GENFIT's consent, as discussed above.  Moreover, CymaBay concealed Dr. Hirschfield's breach
23  from GENFIT, and even after GENFIT confronted CymaBay with the whistleblower allegations,
24  did not come clean to GENFIT about its own or Dr. Hirschfield's misconduct.

25      186.    For these reasons, CymaBay's conduct was also a substantial factor in causing harm
26  to GENFIT.  Further, CymaBay's conduct upon and after receiving the July 17 e-mail from Dr.
27  Hirschfield was a key factor in the damage GENFIT has incurred.

28

1    187.    As a direct and proximate result of Defendants' actions as set forth above, GENFIT

2    has been harmed in an amount to be determined at trial.

3    188.    The above-recited actions of Defendants were done with malice, fraud, oppression,

4    and reckless disregard of the above described rights of GENFIT and within the meaning of

5    California Civil Code § 3294.  Therefore, GENFIT is entitled to recover punitive damages against

6    Defendants.

7
                                   **SIXTH CAUSE OF ACTION**
8    **Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200–17209)**

9    189.    GENFIT re-alleges and incorporates by reference the allegations in paragraphs 1

10   through 188 as though fully set forth herein.  To the extent such allegations include the

11   misappropriation of trade secrets, those trade secret allegations are not incorporated here unless

12   the court finds that such matters do not constitute trade secrets.  If the court makes such a finding,

13   GENFIT reserves its right to seek judicial review, but such allegations will then be incorporated

14   here as involving GENFIT's confidential and proprietary information.  Otherwise, this claim is not

15   predicated on the misappropriation of trade secrets owned by GENFIT.

16   190.    Defendants have violated California's Unfair Competition Law ("UCL"), which

17   prohibits unlawful, unfair, and fraudulent conduct.

18   191.    As laid out above, Defendants intentionally and/or negligently interfered with

19   GENFIT's prospective economic advantage, and aided and abetted Dr. Hirschfield's breach of

20   fiduciary duty.

21   192.    This conduct violates the UCL's proscription against engaging in unlawful conduct.

22   193.    This conduct is also immoral, unethical, oppressive, and significantly threatens or

23   harms competition and, as such, violates the UCL's proscription against engaging in unfair

24   conduct.  In particular, CymaBay's conduct was unfair and a violation of the UCL because it

25   interfered with and disrupted GENFIT's relationship with its lead principal investigator for its

26   Phase 3 ELATIVE™ trial of elafibranor in PBC, who was and is also serving as an investigator

27   for CymaBay's own Phase 3 trial for its drug candidate intended to treat the same disease.  As a

28   direct and proximate result of CymaBay's actions as set forth above, GENFIT has been harmed by

1   losing its lead investigator, a valuable site for the conduct of the clinical trial, its ability to work
2   with other experts at the Toronto Centre for Liver Disease, the loss of its investment in Dr.
3   Hirschfield, and the time and expense necessary in locating alternative trial sites, a new lead
4   investigator, and additional investigators as well as a National Coordinating Investigator in Canada
5   just before the ELATIVE™ trial was about to begin, as well as the disruption of GENFIT's
6   ELATIVE™ trial, regulatory efforts, and commercialization of its products.

7   194.   As a direct and proximate result of Defendants' actions as set forth above, GENFIT
8   has been harmed in an amount to be determined at trial, including full restitution of all financial
9   gain obtained directly or indirectly by Defendants as a result of Defendants' unlawful conduct.

10   **DEMAND FOR JURY TRIAL**

11   Plaintiff demands a jury trial on all claims herein so triable.

12   **PRAYER FOR RELIEF**

13   WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, inclusive
14   as follows:

15   1.   Awarding damages as described in each of the above claims, in favor of Plaintiff and
16        against Defendants in amounts to be determined at trial;

17   2.   Granting a temporary restraining order and a preliminary and permanent injunction
18        enjoining or otherwise requiring Defendants, and any other person or entity
19        participating with or acting for, on behalf of, or in concert with Defendants, including
20        but not limited to their affiliates, officers, directors, shareholders, and employees:

21        a.   From directly or indirectly obtaining, accessing, using, altering, destroying, or
22             copying, disclosing, disseminating, transmitting, or moving to any person or
23             entity other than Plaintiff any of Plaintiff's trade secrets, in whatever form,
24             including but not limited to the Protocol or any information related thereto;

25        b.   From altering, destroying, concealing, erasing, losing, or disposing of any
26             evidence or other materials relating to this action, including but not limited to
27             the Protocol;

28

1       c.   To account for all of GENFIT's misappropriated trade secrets, including by

2             submitting their computers, smartphones, and electronic devices, and to provide

3             access to Defendants' cloud storage services, e-mail servers, or other

4             repositories of electronic information, to a neutral forensic expert who will

5             perform an audit at Defendants' sole expense; and

6       d.   Granting such other injunctive relief as is proper;

7    3.   Granting a permanent injunction enjoining or otherwise requiring Defendants, and any

8       other person or entity participating with or acting for, on behalf of, or in concert with

9       Defendants, including but not limited to their affiliates, officers, directors,

10      shareholders, and employees:

11       a.   From making, testing, promoting, offering to sell, marketing, or selling

12             therapeutics, drugs, and/or products of any kind that utilize, embody, or were

13             developed, in whole or in part, with the benefit or use of any of GENFIT's trade

14             secrets for three (3) years to prevent unjust enrichment in the form of a "head

15             start" Defendants may have gained from their misappropriation of GENFIT's

16             trade secrets;

17       b.   From utilizing any processes or methods that are derived from, contain, or

18             embody, in whole or in part, any of GENFIT's trade secrets; and

19       c.   From launching, or filing with any regulatory body, any therapeutics, drugs,

20             and/or products that compete with elafibranor, including but not limited to

21             seladelpar, for three (3) years;

22    4.   Awarding punitive and/or exemplary damages in favor of Plaintiff and against

23       Defendants in an amount to be determined at trial;

24    5.   Awarding Plaintiff pre-judgment and post-judgment interest, attorneys' fees and costs,

25       and other expenses incurred in this action; and

26    6.   Granting Plaintiff such other further relief as this Court deems just and proper.

27   Dated: April 16, 2021       Respectfully submitted,

28                      ADAM S. LURIE

SEAN P. MOONEY
**LINKLATERS LLP**

AND

RYAN W. KOPPELMAN
KATHERINE G. RUBSCHLAGER
**ALSTON & BIRD LLP**

*/s/ Adam S. Lurie*

Adam S. Lurie
*Attorneys for Plaintiff GENFIT S.A.*